Exhibit 5

BOIES SCHILLER FLEXNER LLP
SIGRID S. MCCAWLEY (admitted *pro hac vice*)
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
Telephone: 954.356.0011
smccawley@bsfllp.com

BOIES SCHILLER FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: 702.382.7300
Facsimile: 702.382.2755
rpocker@bsfllp.com

BOIES SCHILLER FLEXNER LLP
SABINA MARIELLA (admitted *pro hac vice*)
LINDSEY RUFF (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: 212.446.2300
smariella@bsfllp.com
lruff@bsfllp.com

*Attorneys for Plaintiffs Sage Humphries,*
*Gina Menichino, RoseMarie DeAngelo,*
*Danielle Gutierrez, Jane Doe 1,*
*and Jane Doe 2*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| SAGE HUMPHRIES, GINA MENICHINO, ROSEMARIE DeANGELO, DANIELLE GUTIERREZ, JANE DOE 1, and JANE DOE 2,<br><br>Plaintiffs,<br><br>vs.<br><br>MITCHELL TAYLOR BUTTON and DUSTY BUTTON,<br><br>Defendants. | Case Number: 2:21-cv-01412-ART-EJY<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW** |

i

1

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................. ix

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ...............................................................................5

      A.    Defendants' Fame .................................................................5

      B.    The New York Times Article .................................................7

      C.    Daily Mail Article .................................................................7

      D.    CNN Article .........................................................................8

      E.    Pointe Magazine Article .......................................................8

      F.    Cosmopolitan Magazine Article ...........................................9

      G.    Good Morning America Interview.........................................10

      H.    Boston Magazine Article ......................................................11

      I.    Defendants' Counterclaims...................................................11

      J.    Plaintiffs' Declarations ........................................................12

LEGAL STANDARD.....................................................................................12

ARGUMENT ................................................................................................13

I.     Defendants Are Barred from Asserting Previously Omitted Compulsory
      Counterclaims. .............................................................................13

      A.    Defendants' Newly Asserted Counterclaims are Compulsory. ...........13

      B.    Defendants Had Actual Notice of Their Newly Asserted Counterclaims
            When They Responded to Plaintiffs' Second Amended Complaint................15

      C.    Defendants' Newly Asserted Counterclaims Had Matured When They
            Responded to Plaintiffs' Second Amended Complaint. ...................16

      D.    Defendants Newly Asserted Counterclaims Were Filed Without Leave............17

II.    Defendants' Defamation Claims Based on Statements to The New York Times Are
      Time Barred. ...............................................................................19

III.   Defendants Must Prove Actual Malice, and No Evidence of Actual Malice Exists.....21

i

  A. Defendants Must Prove Actual Malice Because They Are General Public Figures.................................................................................................22

  B. In the Alternative, Defendants Must Prove Actual Malice Because They Are Limited-Purpose Public Figures. .......................................................24

    1. A Public Controversy Existed at the Time the Defamatory Statements Were Published. ....................................................25

    2. The Alleged Defamation is Related to a Public Controversy.................26

    3. Defendants Voluntarily Injected Themselves into the Public Controversy Through Their Course of Conduct......................................26

  C. Defendants Cannot Show by Clear and Convincing Evidence That Plaintiffs Acted with Actual Malice. ...................................................................27

    1. The Court Must Assess Actual Malice at the Summary Judgment Stage. ...........................................................................28

    2. The Actual Malice Standard Looks to the Subjective Belief of the Speaker. ........................................................................29

    3. There is Insufficient Evidence for a Jury to Conclude by Clear and Convincing Evidence that Plaintiffs Did Not Subjectively Believe Their Statements to Be True..........................................31

IV. Plaintiffs' Statements Are Protected by NRS § 41.637(4). ...........................................32

  A. Plaintiffs' Statements Were Made in Direct Connection with an Issue of Public Interest in a Public Forum......................................................33

  B. Plaintiffs' Statements Meet the Good Faith Prong. ...........................................36

  C. Defendants Have Not Shown a Prima Facie Probability of Prevailing on the Claim............................................................................36

V. Plaintiffs' Statements Are Protected by the Fair Report Privilege. ..............................36

CONCLUSION..............................................................................................39

CERTIFICATE OF SERVICE .......................................................................42

APPENDIX A...............................................................................................43

1

2

## TABLE OF AUTHORITIES

**Cases**

*Abrams v. Sanson*,
   458 P.3d 1062 (Nev. 2020)....................................................................36

*Adelson v. Harris*,
   402 P.3d 665 (Nev. 2017).......................................................................37

*Allen v. Sunbelt Comms Co.*,
   2008 WL 11452330 (D. Nev. Jan. 22, 2008) ...................................30, 31

*Allstate Ins. Co. v. Shah*,
   2017 WL 1228406 (D. Nev. Mar. 31, 2017) ..........................................37

*Am. Title Ins. Co. v. Lacelaw Corp.*,
   861 F.2d 224 (9th Cir. 1988) ...................................................................5

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..........................................................................12, 32

*Anspach v. Meyer*,
   2014 WL 345676 (D. Ariz. Jan. 30, 2014) .............................................17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................21

*Baker v. Gold Seal Liquors, Inc.*,
   417 U.S. 467 (1974) ..........................................................................13, 19

*Blatt v. Pambakian*,
   2021 WL 4352329 (9th Cir. Sept. 24, 2021) ..........................................39

*Bongiovi v. Sullivan*,
   138 P.3d 433 (2006) ................................................................................24

*Bose Corp. v. Consumers Unions of U.S., Inc.*,
   466 U.S. 485 (1984) ..........................................................................28, 29

*Brown v. Tromba*,
   2022 WL 206106 (D. Nev. Jan. 24, 2022) ..............................................20

*Caesars World, Inc. v. Milanian*,
   247 F. Supp. 2d 1171 (D. Nev. 2003) .......................................13, 14, 19

*Cap. One, Nat'l Ass'n v. SFR Invs. Pool 1, LLC*,
   2018 WL 11280816 (D. Nev. Oct. 17, 2018)......................................17, 18

*Carafano v. Metrosplash.com Inc.*,
   207 F. Supp. 2d 1055 (C.D. Cal. 2002).......................................22, 23, 28, 29

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ..................................................................................12

*Cepeda v. Cowles Mags. & Broad., Inc.,*
  392 F.2d 417 (9th Cir. 1968) ...................................................................22

*Choctaw Town Square, LLC v. Kokh Licensee, LLC,*
  2016 WL 4430000 (W.D. Okla. Mar. 16, 2016) ......................................22

*Church of Scientology Int'l v. Behar,*
  238 F.3d 168 (2d Cir. 2001) ..............................................................29, 30

*Church of Scientology v. Wollersheim,*
  49 Cal. Rptr. 2d 620 (1996) .....................................................................35

*Circus Circus Hotels, Inc. v. Witherspoon,*
  657 P.2d 101 (Nev. 1983) .........................................................................38

*Coleman v. Grand,*
  523 F. Supp. 3d 244 (E.D.N.Y. 2021). .....................................................31

*Composite Res., Inc. v. Recon Med., LLC,*
  2018 WL 5886530 (D. Nev. Nov. 9, 2018) ...............................................17

*Cornett v. Gawker Media, LLC,*
  2014 WL 7330940 (D. Nev. Dec. 19, 2014) .............................................19

*Cusano v. Klein,*
  264 F.3d 936 (9th Cir. 2001) ...................................................................16

*CZ Servs., Inc. v. Express Scripts Holding Co.,*
  2023 WL 5695996 (9th Cir. Sept. 5, 2023) ..............................................27

*Daou v. Abelson,*
  2012 WL 1292475 (D. Nev. Apr. 13, 2012) .............................................13

*Davis v. Avvo, Inc.,*
  2012 WL 1067640 (W.D. Wash. Mar. 28, 2012).......................................35

*Dorsey v. Nat'l Enquirer, Inc.,*
  973 F.2d 1431 (9th Cir. 1992) .................................................................37

*E.E.O.C. v. Morgan Stanley & Co., Inc.,*
  211 F.R.D. 225 (S.D.N.Y. 2002) ..............................................................18

*Eliott v. Lions Gate Ent. Corp.,*
  639 F. Supp. 3d 1012 (C.D. Cal. 2022) ...................................................35

*Estavilla v. Goodman Grp., LLC,*
  2022 WL 539192 (D. Mont. Feb. 23, 2022).............................................16

iv

*Fink v. Oshins,*
    49 P.3d 640 (Nev. 2002) ...................................................................................38

*Flowers v. Carville,*
    310 F.3d 1118 (9th Cir. 2002) ....................................................................16, 20

*Franchini v. Bangor Publishing Co., Inc.,*
    560 F. Supp. 3d 312 (D. Maine 2021) ...............................................................21

*Garrison v. Louisiana,*
    379 U.S. 64 (1964) ...........................................................................................29

*Giarrusso v. Nevada State Bd. of Med. Examiners,*
    2006 WL 8441893 (D. Nev. Jan. 26, 2006) .......................................................38

*Grenier v. Taylor,*
    183 Cal. Rptr. 3d 867 (Ct. App. 2015) ..............................................................34

*Grishin v. Sulkess,*
    2019 WL 4418543 (C.D. Cal. May 31, 2019) ....................................................27

*Hans v. Homesite Indem. Co.,*
    2009 WL 2169170 (D. Ariz. July 17, 2009)................................................13, 19

*Harte-Hanks Communications v. Connaughton,*
    491 U.S. 657 (1989) .........................................................................................29

*Heller v. NBCUniversal, Inc.,*
    2016 WL 6573985 (C.D. Cal. Mar. 30, 2016) ...................................................22

*Holbrook v. Whorton,*
    473 F. App'x 585 (9th Cir. 2012) ......................................................................29

*Holt v. Urb. League of Portland, Inc.,*
    2023 WL 7017838 (D. Or. Sept. 28, 2023) ........................................................35

*Hughes v. Twenty-First Century Fox, Inc.,*
    304 F. Supp. 3d 429 (S.D.N.Y. 2018) ...............................................................31

*In re Hyundai & Kia Fuel Econ. Litig.,*
    926 F.3d 539 (9th Cir. 2019) ............................................................................20

*In re Smith,*
    52 B.R. 792 (Bankr. E.D. Cal. 1985) ................................................................13

*Jankovic v. Int'l Crisis Grp.,*
    72 F. Supp. 3d 284 (D.D.C. 2014), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016) .............................28

*Jesinger v. Nevada Federal Credit Union,*
    24 F.3d 1127 (9th Cir. 1994) ............................................................................32

v

*Joint Equity Comm. of Invs. of Real Est. Partners Inc. v. Coldwell Banker Real Est. Corp.*,
    2011 WL 13130010 (C.D. Cal. Sept. 6, 2011) ....................................................................21

*Kosor v. Olympia*,
    478 P.3d 390 (Nev. 2020)..................................................................................................36

*L. Offs. of Jon Divens & Assocs., LLC v. LNJ Enterprises, LLC*,
    2013 WL 12122578 (C.D. Cal. May 8, 2013).....................................................................14

*Leidholdt v. L.F.P. Inc*,
    860 F.2d 890 (9th Cir. 1988) ......................................................................................23, 24

*LeVeille v. Upchurch*,
    2021 WL 12092768 (M.D. Fla. Apr. 14, 2021) ..................................................................23

*M.G. v. Time Warner, Inc.*,
    107 Cal. Rptr. 2d 504 (Ct. App. 2001) ...............................................................................34

*Makaeff v. Trump Univ., LLC*,
    715 F.3d 254 (9th Cir. 2013)..............................................................................24, 25, 27

*Manzari v. Associated Newspapers Ltd.*,
    830 F.3d 881 (9th Cir. 2016) ......................................................................................23, 24

*Masson v. New Yorker Mag., Inc.*,
    501 U.S. 496 (1991) ............................................................................................21, 29, 30

*Medure v. Vindicator Printing Co.*,
    273 F. Supp. 2d 588, 597 (W.D. Pa. 2002) ..................................................................30, 31

*Moreira-Brown v. Las Vegas Rev. J., Inc.*,
    648 F. Supp. 3d 1278 (D. Nev. 2023) ....................................................................... passim

*Njgard, Inc. v. Uusi-Kerttula*,
    159 Cal. App. 4th 1027 (Cal. Ct. App. 2008).....................................................................33

*Obsidian Fin. Grp., LLC v. Cox*,
    740 F.3d 1284 (9th Cir. 2014)............................................................................................35

*Pegasus v. Reno Newspapers, Inc.*,
    57 P.3d 82 (Nev. 2002)..........................................................................................24, 27, 28

*Penrose Hill, Ltd. v. Mabray*,
    479 F. Supp. 3d 840 (N.D. Cal. 2020)................................................................................20

*Peterson v. Gannett Co. Inc.*,
    2020 WL 1935520 (D. Ariz. Apr. 22, 2020) ......................................................................22

*Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*,
    946 F. Supp. 2d 957 (N.D. Cal. 2013)................................................................................35

vi

*Planet Aid, Inc. v. Reveal,*
   44 F.4th 918 (9th Cir. 2022) ........................................................................... passim

*Pochiro v. Prudential Ins. Co. of Am.,*
   827 F.2d 1246 (9th Cir. 1987) ................................................................................14

*Ponder v. Wild,*
   2018 WL 473003 (D. Nev. Jan. 18, 2018) .............................................................39

*Pope v. Motel 6,*
   114 P.3d 277 (Nev. 2005) .......................................................................................28

*Prehired, LLC v. Provins,*
   2023 WL 2717509 (E.D. Cal. March 30, 2023) ....................................................35

*Procare Laboratories, Inc. v. Gull Laboratories, Inc.,*
   1995 WL 110137 (9th Cir. March 15, 1995) .........................................................16

*Ralston-Purina Co. v. Bertie,*
   541 F.2d 1363 (9th Cir. 1976) ................................................................................18

*Ratcliff v. Howell,*
   2024 WL 756012 (D. Nev. Feb. 23, 2024) ............................................................12

*Raygarr LLC v. Emps. Mut. Cas. Co.,*
   506 F. Supp. 3d 737 (D. Ariz. 2020) .......................................................................6

*Resolute Forest Prod., Inc. v. Greenpeace Int'l,*
   302 F. Supp. 3d 1005 (N.D. Cal. 2017) .................................................................22

*Sahara Gaming Corp. v. Culinary Workers Union Local 226,*
   984 P.2d 164 (Nev. 1999) .......................................................................................37

*Sipple v. Found. For Nat. Progress,*
   83 Cal. Rptr. 2d 677 (Cal. Ct. App. 1999) ............................................................34

*Smith v. Zilverberg,*
   481 P.3d 1222 (Nev. 2021) ..........................................................................30, 31, 33

*St. Amant v. Thompson,*
   390 U.S. 727 (1968) ................................................................................................29

*Stark v. Lackey,*
   458 P.3d 342 (Nev. 2020) .................................................................................30, 31

*State Farm Fire & Casualty Co. v. Drake Real Estate Group,*
   2024 WL 305386 (C.D. Cal. Jan. 8, 2024) ...........................................................16

*Terry v. Davis Cmty. Church,*
   33 Cal. Rptr. 3d 145 (Cal. Ct. App. 2005) ............................................................34

*Tesla, Inc. v. Tripp*,
   487 F. Supp. 3d 953 (D. Nev. 2020) ...................................................................25

*Todd v. Lovecruft*,
   2020 WL 60199 (N.D. Cal. Jan. 6, 2020)............................................................34

*Tri-Cnty. Equip. & Leasing v. Klinke*,
   128 Nev. 352 (2012).............................................................................................19

*Veterans in Politics Int'l, Inc. v. Willick*,
   2020 WL 891152 (Nev. Feb 21, 2020)..................................................................34

*Waldbaum v. Fairchild Publications, Inc.*,
   627 F.2d 1287 (D.C. Cir. 1980).............................................................................25

*Whittlesea Blue Cab Co. v. McIntosh*,
   472 P.2d 356 (1970) ................................................................................................6

*Wynn v. Associated Press*,
   555 P.3d 272 (Nev. 2024).........................................................................28, 33, 36

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (2001) ............................................................................................19

**Statutes**

Nevada Revised Statute § 11.190 ...............................................................................19

Nevada Revised Statute § 41.657 ...............................................................................32

Nevada Revised Statute § 41.637 .................................................................32, 33, 36

S.C. Code Ann. § 15–3–550 .......................................................................................19

**Rules**

Federal Rule of Civil Procedure 13 .................................................................. passim

Federal Rule of Civil Procedure 56 ...........................................................................12

New York Civil Practice Law and Rules § 215.........................................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**NOTICE OF MOTION AND MOTION**</u>

PLEASE TAKE NOTICE that upon the accompanying memorandum of law, Plaintiffs will move this Court, pursuant to Federal Rule of Civil Procedure 56, for an order granting summary judgment against Defendants Mitchell Taylor Button and Dusty Button on their counterclaims for defamation.

Dated: January 6, 2025

BOIES SCHILLER FLEXNER LLP

/s/ Sigrid S. McCawley
SIGRID S. MCCAWLEY (*pro hac vice*)
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
Telephone: 954.356.0011
smccawley@bsfllp.com

LINDSEY RUFF (*pro hac vice*)
SABINA MARIELLA (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone: 212.446.2300
smariella@bsfllp.com
lruff@bsfllp.com

RICHARD J. POCKER (NV Bar No. 3568)
BOIES SCHILLER FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: 702.382.7300
Facsimile: 702.382.2755
rpocker@bsfllp.com

*Attorneys for Plaintiffs Sage Humphries,*
*Gina Menichino, RoseMarie DeAngelo,*
*Danielle Gutierrez, Jane Doe 1,*
*and Jane Doe 2*

ix

Plaintiffs, by and through their undersigned attorneys, submit this Motion for Summary Judgment against Defendants Dusty Button and Mitchell Taylor Button, respectfully requesting that the Court grant Plaintiffs summary judgment as to Defendants' defamation counterclaim.

## PRELIMINARY STATEMENT

Defendants' sole remaining counterclaim for defamation must be rejected on multiple, independent grounds. Defendants' defamation counterclaims are (1) compulsory counterclaims that were waived; (2) time-barred; (3) barred by the fair report privilege; (4) legally insufficient due to lack of evidence of actual malice; and/or (5) barred by Nevada's Anti-SLAPP statute.

At a threshold matter, Defendants' defamation counterclaims against four of the six Plaintiffs[1] are compulsory counterclaims that Defendants forfeited. As the Court acknowledged in its August 5, 2024, Order, a "pleading must state as a counterclaim any claim that-at the time of its service-the pleader has against an opposing party if the claim arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." [ECF No. 379 at 13 ("Dismissal Order")]. Yet in response to the Second Amended Complaint, Defendants asserted a defamation counterclaim against only Plaintiff Sage Humphries, and for only two statements. Defendants failed to assert counterclaims against the other Plaintiffs, and for the various other allegedly defamatory statements made by Sage, even though Defendants were represented by competent counsel at the time they responded to the Second Amended Complaint. [*See* ECF No. 67].

In the Dismissal Order, the Court deferred ruling as to whether Defendants' new counterclaims were "waived compulsory counterclaims" because "the record is unclear as to when Defendants became aware of the facts underlying their new defamation counterclaims,

---

[1]     Defendants do not assert a defamation counterclaim against Plaintiff Jane Doe 2, and Defendants defamation counterclaim against Plaintiff Sage Humphries was not waived to the extent it was asserted in response to Plaintiffs' Second Amended Complaint.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

and thus whether Defendants were required to bring the claims earlier." [Dismissal Order at 13–14]. The Court specifically noted that "Plaintiffs may raise this issue again at the motion for summary judgment stage." [*Id.* at 13]. The record is now crystal clear that Defendants were aware of all the allegedly defamatory statements at the time they responded to the Second Amended Complaint. **Every single article predates the Second Amended Complaint. Five of the seven articles *quote Defendants' <u>own</u> counsel*. The remaining two articles expressly state that Defendants were contacted for comment but declined to respond**. There is thus no question that Defendants had actual notice of all the allegedly defamatory statements at the time they responded to the Second Amended Complaint, yet they failed to assert their new counterclaims, despite being required to do so under Rule 13. In any event, under Rule 13, actual notice is not even required—all that is required is that Plaintiff's allegedly defamatory statements predated Defendants' responsive pleading, which occurred here. Defendants thereby forfeited their new defamation counterclaims, and they must be dismissed as barred.

All of Defendants' defamation claims also fail because at the summary judgment stage, Defendants bear the burden of demonstrating that a reasonable factfinder could, by clear and convincing evidence, find that Plaintiffs' alleged statements were made with actual malice, and here, no evidence of actual malice exists. In the Dismissal Order, the Court found that based on Defendants' pleading, "Defendants are not limited purpose public figures" and therefore need not allege actual malice. [Dismissal Order at 11]. But at that stage, the Court was confined to the four corners of Defendants' complaint. At the summary judgment stage, by contrast, the Court must look to evidence beyond the pleadings, which undoubtedly shows that Defendants are, at a minimum, limited purpose public figures, who must demonstrate actual malice.

For example, this year, Defendants have filed over six lawsuits against Plaintiffs' loved ones, and in each complaint, Defendants plead in detail how they intentionally cultivated and

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

monetized their publicity—so much so **they managed to live off their name and likeness alone**. And they didn't just scrape by, either. **They made millions**. These allegations are binding judicial admissions, and they are more than sufficient to prove Defendants are—at a minimum—limited purpose public figures. Defendants may not boast about their fame and fortune in courts across the country, then downplay their success here in the hopes of avoiding the legal standards applicable to public figures like themselves.

Because Defendants are at least limited purpose public figures, they bear the burden of demonstrating that a reasonable factfinder could, by clear and convincing evidence, conclude that Plaintiffs made the allegedly defamatory statements with actual malice—that is, with knowledge of their falsity or reckless disregard for their truth. Critically, the actual malice inquiry focuses not on the objective truth, but rather, the speaker's subjective state of mind. It is irrelevant whether *Defendants* believe that their sexual interactions with Plaintiffs were consensual—if *Plaintiffs* subjectively believe those interactions were abusive, Defendants cannot prove actual malice, and Defendants' defamation claims must be dismissed. The Court has a duty to independently evaluate actual malice at the summary judgment stage, and there is no evidence whatsoever that Plaintiffs subjectively believe any of their statements were false.

Plaintiffs' statements are also protected by Nevada's Anti-SLAPP statute as statements made in connection with a matter of public concern, and they are also protected by Nevada's fair report privilege because they merely summarize and describe allegations that were already accessible in Plaintiffs' publicly available complaint.

It is no surprise that Defendants' defamation counterclaims are meritless, considering that they were filed as part of a long and improper intimidation campaign—not because they are grounded in the law or the facts. Defendants are seasoned predators who exploited their positions of power in the dance world to sexually abuse young dancers across the country, and

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

1  they are now using social media, vexatious litigation, baseless counterclaims, and other tactics

2  to continue to harm the girls and women who have bravely spoken out against them.

3      Indeed, in response to this lawsuit, the Buttons initiated a vicious online bullying

4  crusade against their victims that became so severe, it caused one of the plaintiffs—a seventh

5  victim—to withdrawn from the lawsuit entirely. [*See, e.g.*, ECF No. 402 (detailing Defendants'

6  misconduct)]. They then lied about that bullying crusade in open court to Judge Youchah, and

7  while under oath in related restraining order proceedings. [*See id.*] Subsequent discovery proved

8  Defendants' denials of their involvement in the online intimidation campaign to be lies and

9  perjury. [*See id.*] The online intimidation campaign continues through the present day.

10

11      Defendants' intimidation tactics do not stop there. This year alone, Defendants have

12  filed at least *six* frivolous lawsuits against Plaintiffs' family, friends, therapists, *pro bono*

13  counsel, and other supporters, in a transparent attempt to frighten their victims and intimidate

14  potential witnesses. [*See id.*].[2] Just last month, a federal court in the District of New Hampshire

15  dismissed one of those lawsuits as a "frivolous and vexatious attempt to intimidate friends and

16  family of the Nevada plaintiffs," concluding,

17

18      **It is beyond reasonable debate that the Buttons' various pleadings in this
     case** (including the original complaint and the amended complaint) **contain
19   sealed, highly confidential materials from the Nevada Litigation that the
     Buttons submitted to this court in violation of several orders of the Nevada
20   court**. That alone is likely sufficient grounds to dismiss their claims. See Fed.
     R. Civ. P. 41(b). But, turning to the merits of their claims and **even charitably
21   construing the amended complaint**, it fails to plausibly allege the essential
     elements of any viable claims against either the Roes or Attorney Melone.
22   Indeed, **the Buttons' claims lack any legal merit**.

23  *Button et. al. v. Roe et. al.*, 1:24-cv-00220-SM-AJ (D.N.H.), ECF No. 47 at 6, 18 (emphasis

24

25

26  _____

27  [2]      *Button et al. v. Breshears,* 1:24-cv-03757-MKV (S.D.N.Y.); *Button et al. v. McCawley*,
     0:24-cv-60911-DSL (S.D. Fla.); *Button et al. v. Doherty et al.*, 1:24-cv-05026-JPC-KHP
     (S.D.N.Y.); *Button et al. v. Humphries et. al.*, 8:24-cv-01730-JVS-DFM (C.D. Cal.); *Button et
28  al. v. Roe et al.*, 1:24-cv-00220-SM-AJ (D.N.H.); *Button et al. v. New York Times Co. et. al.*,
     1:24-cv-05888-MKV (S.D.N.Y.).

1   added). The court further emphasized that "[t]he Buttons' bald and conclusory denials" of

2   Plaintiffs' claims were "wholly insufficient to show that the Nevada litigation is . . . based upon

3   false accusations." *Id*. at 14.

4       As is most pertinent here, Defendants also filed counterclaims which call their victims—

5   five of whom were minor children at the time of the abuse—jealous liars who made up

6   harrowing, detailed abuse allegations as part of the "Me Too" movement all to get famous.

7   Never mind that Plaintiffs Gina, Danielle, Jane Doe 2, and Sage filed police reports against

8   Defendants way back in 2018. Never mind that after a full and fair hearing in 2017, a Boston

9
10  court "fully credited" Plaintiff Sage's testimony and said it was "satisfied **beyond a reasonable**

11  **doubt**" that Sage's relationship with Defendants "**in every regard, in every way, meets the**

12  **requirements of and the definition of abuse**" under Massachusetts law. [ECF No. 77-2 at

13  61:2–62:3 (emphasis added)]. Defendants' story simply does not add up.

14      Defendants' defamation counterclaims are unsupported by the law or the facts, and they

15  were asserted as a mere intimidation tactic. Plaintiffs respectfully request that the Court grant

16
17  Plaintiffs summary judgment as to Defendants' sole remaining counterclaim for defamation.

18                          **STATEMENT OF FACTS**

19      A.    **Defendants' Fame**

20      Defendants have filed at least six complaints in federal district courts across the United

21  States, and in each one, Defendants plead that their **"names and likeness" alone generated**

22  **"one hundred percent" of their yearly revenue, which was "millions of dollars.**" [*See, e.g.,*

23  McCawley Decl. Ex. X ¶¶ 38, 379; Ex. Y ¶ 42; Ex. Z ¶¶ 38, 103; Ex. AA ¶¶ 59, 419; Ex. BB

24  ¶¶ 70, 263; Ex. CC ¶¶ 12, 414].[3] (emphasis added).

25
26  _____

27  [3]    Defendants' statements in pleadings in other cases are judicial admissions that are
    binding on Defendants. *See, e.g., Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th
28  Cir. 1988) (statements and facts within pleadings and pretrial orders are considered judicial

1    Defendants' various pleadings state that Dusty was a "*world-renowned*" member of the

2 dance community and Taylor was an "idol" in the automotive industry. [*See, e.g.*, McCawley

3 Decl. Ex. X ¶¶ 28, 451 (emphasis in original)]. Defendants describe themselves as "extremely

4 well-known," "influen[tial]," and "well established for over fifteen years." [*Id.*, Ex. X ¶¶ 31,

5 34, 419; Ex. Y. ¶¶ 35, 38, 135; Ex. Z. ¶¶ 31, 34, 323; Ex. AA. ¶¶ 52, 55, 427; Ex. BB. ¶¶ 63,

6 66, 273; Ex. CC. ¶¶ 5, 8, 421]. They stress how—like other famous sports figures and

7 entertainers—they had over forty-eight "sponsors" including prominent companies like Adidas

8 and RedBull. [*Id.*, Ex. X ¶ 436; Ex. Y ¶ 151; Ex. Z ¶ 340; Ex. AA ¶ 446; Ex. BB ¶ 288; Ex. CC

9 ¶ 438]. Defendants further allege that over the course of their careers, they jointly amassed

10 around one million social media followers, [*e.g., id.*, Ex. X ¶ 32, 36], Taylor was procured for

11 speaking engagements around the globe, [*id.*, Ex. X ¶ 35; Ex. Y ¶ 39; Ex. Z ¶ 35, Ex. AA ¶ 56],

12 they were both featured in media publications across the globe, [*id.* Ex. X ¶¶ 31, 34; Ex. AA ¶¶

13 52, 55; Ex. BB ¶¶ 63, 66; Ex. CC ¶¶ 5, 8], that entire "fan pages" were devoted to them, [*id.*,

14 Ex. Z ¶¶ 80–81; Ex. AA. ¶ 256], that they were at the "pinnacle" of their careers at the time of

15 the complaint in this action was filed, [*id.* Ex. X ¶¶ 450-451], and that they "positively

16 influenced hundreds of thousands of people nationally and internationally." [*Id*. Ex. X ¶ 31, 35;

17 Ex. Y ¶ 35, 39; Ex. Z ¶ 31, 35; Ex. AA ¶ 52, 56; Ex. BB ¶ 63, 67; Ex. CC ¶ 5, 9].

18

19    In this action, Taylor testified that Dusty was "famous since she was a kid," and was in

20 fact, "one of the most famous dancers in the world." [McCawley Decl., Ex. B (T. Button Dep.

21 Tr.) at 53:24–25, 165:5–6]. Dusty also testified it was not "uncommon" for her to be approached

22

23

24    _____

25 admissions and are binding on the party that filed them); *Raygarr LLC v. Emps. Mut. Cas. Co.*,
506 F. Supp. 3d 737, 747 (D. Ariz. 2020) (holding that plaintiff's pleadings in a prior litigation

26 were admissible as an admission of party opponent); *Whittlesea Blue Cab Co. v. McIntosh*, 472
P.2d 356, 357 (1970) (stating that as a general rule, a pleading "containing an admission is

27 admissible against the pleader in a proceeding subsequent to the one in which the pleading is
filed").

28

6
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

1  by dancers that "kn[e]w who [she was]" and "follow[ed] [her] on Instagram." [McCawley Decl.,
2  Ex. A (D. Button Dep. Tr.) at 114:12–16]. She further testified that Defendants "had a lot of
3  fans" and "fan pages." [*Id*. 217:2–5].

4      Indeed, a multitude of articles discuss Defendants' fame and influence in the dance
5  world well before this action was ever filed. [*See, e.g.*, McCawley Decl., Exs. C, D, E, F, G, H,
6  I, J, K, L, M, N, O, P]. One of many examples describing Defendants' fame and influence is
7  the Boston Magazine article that Defendants rely on in their counterclaims, which states,
8

9      Dusty wasn't merely the star of the Boston Ballet, she was a dance world
10     phenom: A master of classical technique who possessed some 300,000
       Instagram followers, she was known and worshipped by young aspiring dancers
11     everywhere. Legions of young women around the world—including Sage—
       wanted to meet her and wanted to be like her.

12  [McCawley Decl., Ex. W].

13      **B.    The New York Times Article**

14      On July 29, 2021, The New York Times published an article about this litigation.
15  [McCawley Decl., Ex. Q (7/29/21 New York Times Article)]. The article attributes the
16  following statements to Plaintiff Sage Humphries: (1) "They had complete control over me. If
17  I wanted to do anything, I had to ask them first;" and (2) "They had control over my phone and
18  passwords to my Instagram, my email." [*Id.*]
19

20      The article attributes the following statement to Plaintiff Gina Menichino: "The whole
21  game was to keep him happy… Don't get him angry, or I was unworthy and I would lose my
22  dance career." [*Id.*]

23      The article also includes a quote from Ken Swartz, "a lawyer who [was] speaking for"
24  Defendants, which sets forth Defendants' position and says they "deny" Plaintiffs' claims. [*Id.*]
25

26      **C.    Daily Mail Article**

27      On September 28, 2021, the Daily Mail published an article about this litigation
28  [McCawley Decl., Ex. R (9/28/21 Daily Mail Article)]. The article attributes the following

1    statement to Plaintiff Jane Doe 1: "I am grateful to my fellow dancers for bravely bringing this

2    action and for giving me the courage to come forward and speak out about the abuse I endured…

3    Together we can stop the accused – our abusers – from ever damaging another young,

4    vulnerable dancer." [*Id.*]

5        The article contains the following statement: "DailyMail.com has reached out to both

6    McCawley and Randazza [Defendants' former counsel] for statements." [*Id.*]

7        The article also includes a quote from "Marc Randazza, an attorney for the Buttons,"

8

9    setting forth the Buttons' position, including that they "deny the allegations." [*Id.*]

10        **D.    CNN Article**

11        On September 30, 2021, CNN published an article about this litigation. [McCawley

12    Decl., Ex. S (9/30/21 CNN Article)]. Defendants allege the article contains the following

13    statement attributed to Jane Doe 1: "I am grateful to my fellow dancers for bravely bringing

14    this action and for giving me the courage to come forward and speak out about the abuse I

15    endured… Together we can stop the accused – our abusers from ever damaging another young,

16    vulnerable dancer." [ECF No. 231 ¶ 119]. However, no such statement appears in the article,

17
     and the article instead focuses on summarizing the complaint.
18

19        The article does, however, include a statement from Defendants' former counsel, Marc

20    Randazza, denying Plaintiffs' claims. [McCawley Decl. Ex. S (9/30/21 CNN Article)].

21        **E.    Pointe Magazine Article**

22        On December 1, 2021, Pointe Magazine published an article about this litigation.

23    [McCawley Decl. Ex. T (12/1/21 Pointe Magazine Article)]. The article attributes the following

24    statements to Sage Humphries: (1) "One day it was just us hanging out and the next I had no

25    control over the activities that I did, even if it was just doing laundry or going to the grocery

26    store;" (2) "By the time that it got really bad I was completely trapped;" (3) "I had a friend ask

27    me if I was okay, and I was hyper-defensive because I was told by my abusers to shut down

28

                                   8
                PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
                 AND INCORPORATED MEMORANDUM OF LAW

any criticism of them." [*Id.*]

The article also states, "A lawyer for the Buttons, who have denied the allegations, did not respond to requests for comment." [*Id.*]

**F.    Cosmopolitan Magazine Article**

On April 5, 2022, Cosmopolitan published an article about this litigation. [McCawley Decl., Ex. U (4/5/22 Cosmopolitan Article)]. The article includes the following statements regarding Plaintiff Sage Humphries: (1) "This was calculated. These people are predators. This is a pattern;" (2) "Their friendship began in the studio. Then Dusty invited Sage to come to her apartment. The walls were painted black. In one room, a collection of guns was displayed. That's when Sage met Taylor;" (3) "Later, when he offered to manage her social media, it made sense to say yes;" (4) "Taylor got the passwords to Sage's phone, email, and accounts. That's when he started monitoring her communication. Infiltrating everything;" (5) "Now it's interesting to me how the most evil people hide in plain sight, where no one would expect." [*Id.*]

The article includes the following statements regarding Plaintiff Gina Menichino: (1) "'It's the first memory of when the grooming began.' … [that Counterclaimant Mitchell Taylor Button] gave her a teddy bear sprayed with his cologne, so she could feel like she was 'sleeping' with him…;" (2) "[h]e devised reasons for them to be alone together [and] [i]t went on for a year and a half;" (3) "He [Counterclaimant Mitchell Taylor Button] made her believe that telling anyone about 'them' would ruin her career." [*Id.*]

The article includes the following statement about Plaintiff Rosemarie DeAngelo: "Rosie wanted them to like her, so she decided to go with the flow. Even if it meant downplaying his unsettling attention. Like how he would insist on taking her out to lunch. And how he slid sexual innuendos into their conversations. Later, after he cornered her alone, he manipulated her into believing that nothing bad was happening to her. He claimed it wasn't

9
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

illegal because he wasn't that much older…He was her mentor; he told her it was okay." [*Id.*]

The article includes the following statements regarding Plaintiff Danielle Gutierrez: (1) "First, he was her teacher who told her she was like his 'little sister;'" (2) "Their [Taylor and Danielle's] 'relationship' affected everything: her mental health, her sense of safety. Even where she went to college — he convinced her to stay local. And because he didn't want her partnering with other men in classes there, she paused on studying dance. He yelled, berated her in public. If someone attempted to intervene, he scared them off by becoming belligerent. She started believing no one could help her. In the worst moments, she was afraid for her life." [*Id.*]

The article also contains the following statement: "The Buttons have filed a motion to dismiss in which they deny any wrongdoing; when reached by Cosmopolitan, their attorney declined to provide additional comment." [*Id.*]

### G.    Good Morning America Interview

On May 27, 2022, Good Morning America aired an interview with Plaintiff Sage Humphries about this litigation. [McCawley Decl., Ex. V (5/27/22 Good Morning America Interview transcript)]. During the interview, Plaintiff Sage Humphries made the following statement,

> [Taylor] suggested that we all watch a movie together. [The Buttons] thought we should all have one big group sleepover and bring the mattresses out into the living room. I thought, again, that that was uncomfortable, so we just hung out, we watched a movie and Dusty had fallen asleep. I was falling asleep. And when I was falling asleep, that was the first time that [Mitchell] violated me. And you think that you're going to know to scream or to get up or to make a loud noise or do anything to stop it from happening, but I just froze and my body just tightened and I just waited for it to be over.

[*Id.*]

The interview also included a statement from "[a]n attorney for the Buttons" denying "all allegations in the complaint." [*Id.*]

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

### H. Boston Magazine Article

On August 2, 2022, Boston Magazine published an article about this litigation. [McCawley Decl., Ex. W (8/2/22 Boston Magazine Article)]. The article includes the following statements regarding Plaintiff Sage Humphries: (1) "When they were all back in Boston, … the couple barged in on her while she was showering and told her she was now their girlfriend. It was not posed as a question;" (2) "the pair had sex with Sage whenever they wanted, without her consent;" (3) "…she had grabbed someone's phone to message Taylor via snapchat, who, along with Dusty, was in Australia. According to the lawsuit, Taylor responded that he wanted to throw Sage in his van, tie her hands and feet, blindfold her, rent a warehouse, hang her from the ceiling, rape her, and leave her to die." [*Id.*]

The article notes that the author sent "Dusty and Taylor's lawyer, Marc Randazza, a so-called 'no surprises' email." [*Id.*]. The article describes a phone call between the author and Mr. Randazza, and states Mr. Randazza directed the author to Defendants' counterclaims the moment they were filed. [*Id.*] The article then discusses Defendants' counterclaims in detail.

### I. Defendants' Counterclaims

In response to Plaintiffs' Second Amended Complaint, Defendants asserted a defamation counterclaim against only Plaintiff Sage Humphries, and only for statements she made on Good Morning America and in Boston Magazine. [ECF No. 67]. On August 2, 2023, Plaintiffs filed a Third Amended Complaint, [ECF No. 221], which made a handful of non-substantive changes, [*see* ECF No. 188 at 3]. In response to Plaintiffs' Third Amended Complaint, Defendants filed new defamation counterclaims, which added claims for statements Sage made to Pointe Magazine, the New York Times, and Cosmopolitan Magazine. [ECF No. 231 ¶¶ 103, 104, 175]. Defendants additionally add a defamation claim against Jane Doe 1 for a statement she allegedly made to CNN, [*id.* ¶ 119], a defamation claim against Gina for statements she made to the New York Times and Cosmopolitan Magazine, [*id.* ¶¶ 129, 130],

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

1
2
and defamation claims against Danielle and Rosie for statements they made to Cosmopolitan Magazine, [*id.* ¶¶ 144, 154].

3
### J.    Plaintiffs' Declarations

4
5
6
7
8
9
Each Plaintiff who is a counterclaim defendant submits herewith a declaration affirming under penalty of perjury that her allegedly defamatory statements are in fact true, and that she subjectively believes her allegedly defamatory statements are true. [*See* Declarations of Sage Humphries ¶¶ 3–4; Gina Menichino ¶¶ 3–4; Rosemarie DeAngelo ¶¶ 3–4, Danielle Gutierrez ¶¶ 3–4, and Jane Doe 1 ¶¶ 3–4].

10
### LEGAL STANDARD

11
12
13
14
15
16
17
18
19
20
21
22
23
24
Summary judgment is appropriate when the evidence presented provides "no genuine dispute as to any material fact." Fed. R. Civ. P. 56. There is no "genuine dispute" if the evidence on the record indicates that a reasonable factfinder could not return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In response to a motion for summary judgment, the non-moving party must respond with specific facts to establish a genuine issue of material fact. *Id.* at 250. These facts must go beyond initial pleadings, allegations, and conclusory statements. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party must go beyond "assertions and allegations of the pleadings and set forth specific facts by producing admissible evidence that shows a genuine issue for trial." *Ratcliff v. Howell*, 2024 WL 756012, at *2 (D. Nev. Feb. 23, 2024) (Traum, J.). Only disputes over facts that "might affect the outcome of the suit" will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

25
26
27
28

**ARGUMENT**

I.    **Defendants Are Barred from Asserting Previously Omitted Compulsory Counterclaims.**

A.    **Defendants' Newly Asserted Counterclaims are Compulsory.**

Defendants' response to the Third Amended Complaint contains sweeping new counterclaims that they failed to assert in response to the Second Amended Complaint. [*See* ECF No. 231 ¶¶ 103, 104, 175, 119, 129, 130, 144, 154 (together, "Newly Asserted Counterclaims")]. The Newly Asserted Counterclaims are compulsory and must be dismissed as barred.

In its August 5, 2024, order, the Court acknowledged that a "pleading must state as a counterclaim any claim that-at the time of its service-the pleader has against an opposing party if the claim arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." [Dismissal Order at 13; *see also* Fed. R. Civ. P. 13(a)]. Indeed, a "counterclaim which is compulsory but is not brought is thereafter barred." *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1 (1974); *see, e.g., Daou v. Abelson*, 2012 WL 1292475, at *1 (D. Nev. Apr. 13, 2012) ("[C]ounterclaims should be asserted in response to the original pleading . . . If a counterclaim should have been asserted in response to the original pleading, it must be treated as an omitted counterclaim"); *Caesars World, Inc. v. Milanian*, 247 F. Supp. 2d 1171, 1202 (D. Nev. 2003) ("[Defendant's] failure to assert . . . compulsory counterclaims in this action means that he has waived them"); *Hans v. Homesite Indem. Co.*, 2009 WL 2169170, at *3 (D. Ariz. July 17, 2009) (dismissing defendant's counterclaims, finding that the counterclaims were "required to be brought at the time that [defendant] filed his answer"); *In re Smith*, 52 B.R. 792, 796 (Bankr. E.D. Cal. 1985) ("In the present case, ATC failed to raise a compulsory counterclaim when the trustee filed his first complaint. The law is clear that the ATC would now be barred from asserting the counterclaim.").

1    Claims arise out of the same transaction or occurrence and are therefore compulsory

2    where, as here, "a separate trial on each of the respective claims would involve a substantial

3    duplication of time and effort by the parties and the court." *Caesars World*, 247 F. Supp. 2d at

4    1201. This is particularly true where, as here, the facts necessary to prove both the original and

5    counter claims substantially overlap such that a plaintiff's success on the merits would preclude

6    the defendant from succeeding on their subsequent claim. *Pochiro v. Prudential Ins. Co. of Am.*,

7    827 F.2d 1246, 1251 (9th Cir. 1987); *see also, e.g.*, *L. Offs. of Jon Divens & Assocs., LLC v.*

8    *LNJ Enters., LLC*, 2013 WL 12122578, at *6 (C.D. Cal. May 8, 2013).

9

10    Here, the Newly Asserted Counterclaims all allege that Plaintiffs lied when accusing

11    Defendants of sexually assaulting them in the media. [*See* ECF No. 231 ¶¶ 206, 229, 252, 276].

12    Accordingly, Defendants' defamation claims "must be considered" compulsory counterclaims

13    because the effect of Plaintiffs' prevailing on the merits of their claims at trial would preclude

14    Defendants from "denying the truth of [Plaintiffs'] statements." *Pochiro*, 827 F.2d at 1251. In

15    other words, the facts necessary to prove Defendants' defamation claims are the same facts

16    necessary to prove Plaintiffs' claims against Defendants, and when Plaintiffs prevail on the

17    merits of their claims at trial, Defendants will be precluded from arguing that Plaintiffs'

18    statements to the media regarding those claims were untrue. *See, e.g.*, *L. Offs. of Jon Divens*,

19    2013 WL 12122578, at *6 (precluding defamation claim and collecting cases where defamation

20    claim was considered compulsory counterclaim).

21

22    Because Defendants' Newly Asserted Counterclaims are compulsory, Defendants

23    waived them by failing to plead them in response to Plaintiffs' Second Amended Complaint—

24    ***despite being represented by competent counsel at the time of filing***. [*See* ECF No. 67].

25

26

27

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

**B.      Defendants Had Actual Notice of Their Newly Asserted Counterclaims When They Responded to Plaintiffs' Second Amended Complaint.**

In the Dismissal Order, the Court deferred ruling whether the Newly Asserted Counterclaims were "waived compulsory counterclaims" because "the record is unclear as to when Defendants became aware of the facts underlying their new defamation counterclaims, and thus whether Defendants were required to bring the claims earlier." [Dismissal Order at 13–14]. The Court specifically noted that "Plaintiffs may raise this issue again at the motion for summary judgment stage." [*Id.* at 13].

The record is clear that Defendants were aware of the facts underlying the Newly Asserted Counterclaims at the time they responded to the Second Amended Complaint. Indeed, all of Plaintiffs' allegedly defamatory statements predated Defendants' original counterclaims, sometimes by more than a year. The alleged defamatory statements referenced in the Newly Asserted Counterclaims were made between July 29, 2021, and August 2, 2022, [ECF No. 231 ¶¶ 104, 102], and Defendants did not file their original counterclaim in response to the Second Amended Complaint until August 12, 2022, [*see* ECF No. 67].

Moreover, every article states that Defendants' attorney was contacted in connection with the article. In fact, the material published by the New York Times, Daily Mail, CNN, Good Morning America, and Boston Magazine all **expressly quote Defendants' attorney**. [*See* McCawley Decl., Exs. Q, R, S, W]. The only two articles that do not expressly quote Defendants' representative are those published by Pointe Magazine and Cosmopolitan Magazine, but both of those articles expressly state that Defendants' attorney was contacted for comment and declined to respond. [*See* McCawley Decl., Exs. T, U]. There is therefore no dispute that Defendants were "aware of the facts underlying their new defamation counterclaims" and were "required to bring the claims earlier." [Dismissal Order at 13–14].

**C.    Defendants' Newly Asserted Counterclaims Had Matured When They Responded to Plaintiffs' Second Amended Complaint.**

Regardless, even if the record were not crystal clear that Defendants had *actual* notice of the facts underlying the Newly Asserted Counterclaims at the time they responded to the Second Amended Complaint (it is), these compulsory counterclaims had still matured for purposes of Rule 13(a) and were therefore forfeited.

Indeed, under Rule 13(a), the relevant question is **not** whether a litigant was actually aware of the facts underlying his counterclaims. Instead, the relevant question is whether the counterclaim had **matured** at the time the defendant served his responsive pleading. *See, e.g.*, *Procare Laby's, Inc. v. Gull Laby's, Inc.*, 1995 WL 110137, at *2 (9th Cir. March 15, 1995) ("A compulsory counterclaim must . . . be mature and owned by the pleader at the time he serves his pleading"); *State Farm Fire & Casualty Co. v. Drake Real Estate Grp.*, 2024 WL 305386, at *1 (C.D. Cal. Jan. 8, 2024) (holding that, for purposes of Rule 13, the defendant's late awareness of his counterclaim was "irrelevant" because the claim "arose as soon as" the initial injury occurred).

"Whether a claim is mature for purposes of Fed. R. Civ. P. 13(a)(1) is synonymous with whether a claim has accrued for statute of limitations purposes." *Estavilla v. Goodman Grp., LLC*, 2022 WL 539192, at *11 (D. Mont. Feb. 23, 2022). Defamation claims accrue (and therefore mature) at the moment a statement is published—not when it is discovered. *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002) ("[A] cause of action for defamation accrues immediately upon the occurrence of the tortious act."); *Cusano v. Klein*, 264 F.3d 936, 949 (9th Cir. 2001) (noting a defamation claim accrues "upon the first general distribution of the publication to the public" and the statute of limitation begins to run "regardless of whether a plaintiff is aware that he has a cause of action").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Therefore, Defendants' defamation counterclaims matured for purposes of Rule 13 the moment Plaintiffs' allegedly defamatory statements were published. *Anspach v. Meyer*, 2014 WL 345676, at *7–8 (D. Ariz. Jan. 30, 2014) (dismissing defamation counterclaims pursuant to Rule 13 because the underlying statements were published "before the lawsuit was filed," therefore the counterclaims matured prior to the date the answer was due and "should have been filed as counterclaims in the underlying lawsuit").

As stated *supra*, here, all of Plaintiffs' alleged statements were made well before Defendants' original counterclaims were filed, sometimes by more than a year. [*Compare* ECF No. 67 (Defendants' original August 12, 2022, counterclaim against only Sage) *with* ECF No. 231 ¶¶ 99, 101–05, 119, 129, 130, 144, 154, 175, 277 (alleging statements contained in Newly Asserted Counterclaims were made between July 29, 2021, and August 2, 2022)]. Accordingly, all of Defendants' Newly Asserted Counterclaims matured prior to the time Defendants filed their original counterclaims in response to Plaintiffs' Second Amended Complaint. Defendants therefore forfeited these claims by failing to assert them at the time their responsive pleading was due, and they are barred under Rule 13(a). *See, e.g.*, *Anspach*, 2014 WL 345676, at *7–8.

**D.      Defendants Newly Asserted Counterclaims Were Filed Without Leave.**

Even if Defendants' new counterclaims were permissive rather than compulsory (they are not), they are barred for the independent reason that newly alleged counterclaims are allowed "without leave of court only when the breadth of the changes in the amended response reflect the breadth of the changes amended complaint." *Cap. One, Nat'l Ass'n v. SFR Invs. Pool 1, LLC*, 2018 WL 11280816, at *2 (D. Nev. Oct. 17, 2018) (cleaned up); *see, e.g.*, *Composite Res., Inc. v. Recon Med., LLC*, 2018 WL 5886530, at *1–2 (D. Nev. Nov. 9, 2018) (striking answer to amended complaint where defendant failed to seek leave before making "many changes" to factual assertions and "add[ing] an affirmative defense" as those changes were not proportional to the changes in the amended complaint); *E.E.O.C. v. Morgan Stanley & Co., Inc.*,

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

211 F.R.D. 225, 227 (S.D.N.Y. 2002) ("If every amendment, no matter how minor or substantive, allowed defendants to assert counterclaims or defenses as of right, claims that would otherwise be barred or precluded could be revived without cause.").[4]

Here, the Third Amended Complaint made only a handful of minor, non-substantive changes, pertaining *only* to Plaintiff Jane Doe 1's allegations. [*Compare* ECF No. 35 ¶¶ 148, 149; *with* ECF No. 221 ¶¶ 137, 138]. But in response, Defendants asserted sweeping new counterclaims against *five* Plaintiffs—none of which had anything to do with the edits Plaintiff Jane Doe 1 made—without leave of court. [*See* ECF No. 231 ¶¶ 168–317]. Since Defendants' Newly Asserted Counterclaims are totally disproportionate and unrelated to the changes Plaintiffs made to the Third Amended Complaint, they are procedurally improper and must be dismissed even if they were permissive rather than compulsory. *See Cap. One, Nat'l Ass'n v. SFR Invs. Pool 1, LLC*, 2018 WL 11280816, at *2–3.

\*        \*        \*

In short, Defendants were well aware of the facts underlying their Newly Asserted Counterclaims when they responded to the Second Amended Complaint, yet they failed to assert them **even though they were represented by competent counsel**. And even if Defendants did not have actual notice of the facts underlying their Newly Asserted Counterclaims (they did), the claims had matured for purposes of Rule 13(a), so Defendants still waived them by failing to assert them in response to the Second Amended Complaint. The Newly Asserted Counterclaims are also improper for the separate and independent reason that they were filed without leave of Court, even though leave was required.

_____

[4]     Even if Defendants had sought leave to allege new counterclaims, leave would have been appropriately denied given the late stage of the proceedings. *Ralston-Purina Co. v. Bertie*, 541 F.2d 1363, 1367 (9th Cir. 1976) (finding no abuse of discretion when court denied leave to assert omitted counterclaim where request for leave "was made six months after the filing of the answer to Purina's complaint and two months after a pretrial conference").

18
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

1
2
3

Defendants forfeited their Newly Asserted Counterclaims, and they must be dismissed as barred. *See, e.g.*, *Baker*, 417 U.S. at 469 n.1; *Caesars World*, 247 F. Supp. 2d at 1202; *Hans*, 2009 WL 2169170, at *3.

4
5

**II.    Defendants' Defamation Claims Based on Statements to The New York Times Are Time Barred.**

6
7
8
9
10

Defendants' defamation counterclaims against Sage and Gina must also be dismissed as time-barred to the extent they are based on statements they made in the New York Times on July 29, 2021. [ECF No. 231 ¶¶ 104, 129]. Nevada law provides a two-year statute of limitation for defamation, *see* NRS § 11.190(4)(c), and Defendants did not sue on these claims until August 23, 2023—over two years later. [*See* ECF No. 231].

11
12
13
14
15

In the Dismissal Order, the Court deferred ruling on whether Defendants' counterclaims based on the New York Times statements are time-barred because "the Court has not yet even determined if Nevada law is the source of the statute of limitations for the claim." [Dismissal Order at 9]. The record is clear at this stage that Nevada law applies.

16
17
18
19
20
21
22
23
24

Indeed, a "federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law," *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (2001), and under Nevada choice-of-law principles, where "a natural person claims that he has been defamed," courts apply the law of "the state where the person was domiciled at the time, if the matter complained of was published in that state." *Cornett v. Gawker Media, LLC*, 2014 WL 7330940, at *4 (D. Nev. Dec. 19, 2014). Here, by their own allegations, Defendants were domiciled in Nevada at the time the New York Times article was published. [ECF No. 231 ¶¶ 3–4].

25
26
27
28

Regardless, Nevada law applies because "no conflict of law exists," so "the law of the forum state" applies. *Tri-Cnty. Equip. & Leasing v. Klinke,* 128 Nev. 352, 354–55 (2012). Indeed, Defendants' current state of residence, South Carolina, also has a two-year statute of

limitation for defamation claims, S.C. Code Ann. § 15–3–550(1), and New York, where the statements were published, has an even shorter one-year statute of limitation, N.Y. C.P.L.R. § 215(3). Accordingly, under all potentially applicable laws, Defendants' counterclaim regarding the New York Times article is time-barred, so there is no conflict of law for the Court to resolve.

Further, where, as here, parties implicitly consent to the application of one jurisdiction's law, that law applies. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 561–62 (9th Cir. 2019). Defendants have never argued anything other than Nevada law governs their defamation claim, even when represented by competent counsel. [*See, e.g.*, ECF Nos. 67, 231, 249].

In the Dismissal Order, the Court additionally deferred ruling on Plaintiffs' statute of limitations argument because "the defamation claim involves multiple events." [Dismissal Order at 9]. But where, as here, a defamation claim involves multiple allegedly defamatory statements, the timeliness of each statement is assessed individually. *See, e.g.*, *Flowers*, 310 F.3d at 1126. Courts routinely dismiss portions of defamation claims as untimely, even if other portions are allowed to proceed as timely. *See, e.g.*, *id.* at 1127 (dismissing one defamation claim to the extent it was based on time-barred statement, while allowing another claim based on more recent statements to proceed); *Penrose Hill, Ltd. v. Mabray,* 479 F. Supp. 3d 840, 850–53 (N.D. Cal. 2020) (concluding defamation claim based on older blog post was untimely while claim based on more recent tweets was not time-barred); *see also Brown v. Tromba*, 2022 WL 206106 at *5–6 (D. Nev. Jan. 24, 2022) (assessing timeliness of each statement individually and concluding "all of the specific dates" fell outside of the statute of limitations).

Accordingly, Defendants' defamation counterclaim must be dismissed to the extent it is based on Sage and Gina's statements to the New York Times, which were made more than two years before Defendants filed their counterclaims. [ECF No. 231 ¶¶ 104, 129].

### III.  Defendants Must Prove Actual Malice, and No Evidence of Actual Malice Exists.

1
2          All Defendants' defamation counterclaims fail for the separate and independent reason
3
4    that, at summary judgment, Defendants must show that a reasonable finder of fact could
5    conclude, by clear and convincing evidence, that Plaintiffs' alleged statements were made with
6
7    actual malice. *See, e.g.*, *Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 928 (9th Cir. 2022) (holding
8    that a defamation claim can against a public figure can survive "summary judgment motion
9    'only if the evidence in the record would permit a reasonable finder of fact, by clear and
10   convincing evidence, to conclude that [defendants] published a defamatory statement with
11   actual malice'") (quoting *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 508 (1991)).
12   Defendants cannot do so here.
13
14         In the Dismissal Order, the Court found that based on the allegations contained in
15   Defendants' pleading, "Defendants are not limited purpose public figures" and therefore need
16   not allege actual malice. [Dismissal Order at 11]. But at the pleading stage, the Court was
17   confined to the four corners of Defendants' counterclaims. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S.
18   662, 674–79 (2009). At the summary judgment stage, by contrast, the Court must consider
19   evidence outside the pleadings, which undoubtedly shows that Defendants are general public
20   figures or, at a minimum, limited purpose public figures. *See Joint Equity Comm. of Invs. of
21   Real Est. Partners Inc. v. Coldwell Banker Real Est. Corp.*, 2011 WL 13130010, at *3 (C.D.
22   Cal. Sept. 6, 2011) ("On a motion to dismiss, the Court looks mostly at what facts a plaintiff
23   alleges, while at summary judgment, the Court looks at what the evidence ultimately shows
24   about those allegations."). Given the differing information available, courts have made rulings
25   regarding public figure status at the summary judgment stage that depart from the rulings they
26   made at the pleading stage. *See, e.g.*, *Franchini v. Bangor Publ'g Co., Inc.*, 560 F. Supp. 3d
27   312, 316 (D. Maine 2021) (determining that the plaintiff is a public figure at the summary
28

1    judgment stage when the court was unable to do so at the motion to dismiss stage due to the

2    "undeveloped record"); *see also Choctaw Town Square, LLC v. Kokh Licensee, LLC*, 2016 WL

3    4430000, at *4–7 (W.D. Okla. Mar. 16, 2016) (holding that the plaintiff is a public figure based

4    on "new evidence" despite previously determining that the plaintiff was not a public figure).

5        The determination of whether Defendants are public figures "is a question of law."

6    *Carafano v. Metrosplash.com Inc.*, 207 F. Supp. 2d 1055, 1070 (C.D. Cal. 2002), *aff'd on other*

7    *grounds,* 339 F.3d 1119 (9th Cir. 2003). Because Defendants are—at a minimum—limited

8    purpose public figures, they must prove that a reasonable fact finder could conclude by "clear

9    and convincing evidence" that Plaintiffs' publications were motivated by "actual malice," and

10   Defendants cannot do so here. *Id.* at 1070–73 (granting summary judgment on defamation claim

11   for failure to demonstrate actual malice).

12

13       **A.    Defendants Must Prove Actual Malice Because They Are General Public**
14              **Figures.**

15       By Defendants' own allegations, they are general-purpose public figures. Public figures

16   can include "artists, athletes, business people, dilettantes, and anyone who is famous or

17   infamous because of who he is or what he has done." *Cepeda v. Cowles Mags. & Broad., Inc.*,

18   392 F.2d 417, 419 (9th Cir. 1968). Courts consider a party's "own allegations" when

19   determining whether he or she is a public figure. *See, e.g., Peterson v. Gannett Co. Inc.*, 2020

20   WL 1935520, at *6 (D. Ariz. Apr. 22, 2020) (concluding plaintiff was a limited purpose public

21   figure because he alleged he was a "well-known technology entrepreneur"); *Resolute Forest*

22   *Prod., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1017 (N.D. Cal. 2017) ("[Plaintiff's]

23   own allegations about their world-wide reach and influence, as well as the public nature of its

24   work in forestry and sustainability, show that the company is a limited public figure for

25   purposes of its participation in the forestry industry"); *Heller v. NBCUniversal, Inc.*, 2016 WL

26

27   6573985, at *5 (C.D. Cal. Mar. 30, 2016) (finding plaintiff to be a limited-

28

1  purpose public figure where "Plaintiff's own allegations show that his relationship with N.W.A.

2  was the subject of great public interest that prompted him to write a book recounting his side

3  of the story").

4        Here, as discussed *supra*, Defendants themselves have alleged over and over again in

5  complaints across the country that they are "world-renowned"—so much so that they lived off

6  their name and likeness alone, to the tune of millions of dollars. *See supra*, Statement of Facts,

7  Section A. While this Court found, at the pleading stage, that "Defendants are not limited

8  purpose public figures," [Dismissal Order at 11], at that stage, the Court was confined to

9  Defendants' pleading in this action, which contains none of the above allegations stating that

10 Defendants were so famous they lived off their name, image, and likeness alone, that "global

11 organizations" "procured" them "for speaking engagements," entire "fan page[s]" were devoted

12 to them, they were at the "pinnacle" of their careers at the time of the original complaint, that

13 their Instagram accounts combined for "a million" followers, and the list goes on. *See supra*,

14 Statement of Facts, Section A.

15       These allegations—which are judicial admissions and are binding on Defendants—are

16 more than sufficient to demonstrate Defendants' general public figure status. *See, e.g.*, *Manzari*

17 *v. Associated Newspapers Ltd.*, 830 F.3d 881, 888–89 (9th Cir. 2016) (concluding soft-core

18 porn actress who was subject to "news coverage related to her considerable success performing

19 in and marketing online soft-core porn" was a public figure); *Leidholdt v. L.F.P. Inc*, 860 F.2d

20 890, 892–93 (9th Cir. 1988) (concluding leader in the anti-pornography movement, who had

21 participated in numerous news article and public debates on the topic of pornography, was a

22 public figure "[b]y her own description"); *Carafano*, 207 F. Supp. 2d at 1071–72 (actress with

23 a fan website was a general purpose public figure); *LeVeille v. Upchurch*, 2021 WL 12092768,

24 at *2 (M.D. Fla. Apr. 14, 2021) ("Defendant's significant social media presence and the nature

25

26

27

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

1   of his profession as a country music performer are further indicia of his public figure status.").

2   The extensive media coverage regarding Defendants, which forms the basis of their defamation

3   counterclaims, further cements their public figure status. *See, e.g.*, *Manzari*, 830 F.3d at 888–

4   89; *Leidholdt*, 860 F.2d at 892.

5          **B.     In the Alternative, Defendants Must Prove Actual Malice Because They
6                    Are Limited-Purpose Public Figures.**

7          In the alternative, Defendants must plead actual malice because they are—at a

8   minimum—limited purpose public figures. A limited purpose public figure is a person who

9   voluntarily injects himself or is thrust into a particular public controversy and thereby becomes

10  a public figure for a limited range of issues. *See Pegasus v. Reno Newspapers, Inc*., 57 P.3d 82,

11  90–91 (Nev. 2002); *Bongiovi v. Sullivan*, 138 P.3d 433, 445 (2006). To assess limited public

12  figure status, courts in the Ninth Circuit consider whether: (1) a public controversy existed when

13  the statements were made; (2) the alleged defamation was related to the plaintiff's participation

14  in the controversy; and (3) the plaintiff voluntarily injected himself into the controversy for the

15  purpose of influencing the controversy's ultimate resolution. *Planet Aid*, 44 F.4th at 925;

16  *Makaeff v. Trump Univ*., *LLC*, 715 F.3d 254, 266 (9th Cir. 2013).

17

18          In the Dismissal Order, the Court held that Defendants are not limited purpose public

19  figures because Plaintiffs failed to allege Defendants "voluntarily inserted themselves into a

20  prominent role in the public issue of sexual abuse in the dance industry." [Dismissal Order at

21  16]. However, as discussed further below, courts in the Ninth Circuit do not use such a narrow

22  construction of the voluntariness prong. *See, e.g.*, *Planet Aid*, 44 F.4th at 926. Under binding

23  Ninth Circuit precedent, Defendants are certainly (at the very least) limited purpose public

24  figures. *Id*.

25

26

27

28

1.     A Public Controversy Existed at the Time the Defamatory Statements Were Published.

As to the first prong, there was a public controversy surrounding Defendants at the time the allegedly defamatory statements were published. A public controversy exists if the issue is being debated publicly and had foreseeable "ramifications for nonparticipants." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296–97 (D.C. Cir. 1980). Individuals commenting in an online forum to discuss concerns about the figure are sufficient to establish a public controversy. *See Makaeff*, 715 F.3d at 267; *see, e.g.*, *Tesla, Inc. v. Tripp*, 487 F. Supp. 3d 953, 970–71 (D. Nev. 2020) (concluding that a "public controversy" existed surrounding "the Model 3's production" where it was reported on by the mainstream media).

By Defendants' own judicial admissions, a public controversy surrounding Defendants' history of sexually abusing young dancers began with an Instagram post by a third-party named Madison Breshears—which she posted on May 13, 2021, before this case was filed, and before any Plaintiff's first allegedly defamatory statement was made. [*See* McCawley Decl., Ex. Z ¶¶ 58, 59]. Defendants allege that beginning on May 13, 2021, in response to Ms. Breshears's post, Defendants began receiving "hundreds of thousands" of social media comments about their behavior, which "spread like fuel-soaked wildfire" throughout the "dance industry," "automotive industry," and further to "dance and automotive forums including but not limited to Facebook, Reddit, and TikTok and was widely spread via communications through messaging platforms nationally and internationally." [*Id.* ¶¶ 106, 331].

These allegations are more than sufficient to satisfy the public controversy requirement. *See, e.g.*, *Makaeff*, 715 F.3d at 267 (finding "posting complaints on public Internet message boards" was sufficient to establish a public controversy).

25
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

2.    The Alleged Defamation is Related to a Public Controversy.

As to the second prong, Plaintiffs' allegedly defamatory statements relate directly to the public controversy surrounding Defendants' alleged history of sexually abusing young dancers. Indeed, all of the allegedly defamatory statements concern Plaintiffs' own experiences being abused by Defendants. [*See* ECF No. 231 ¶¶ 99, 101–05, 119, 129, 130, 144, 154, 175, 277].

3.    Defendants Voluntarily Injected Themselves into the Public Controversy Through Their Course of Conduct.

As to the third prong, Defendants engaged in conduct that invited public comment and scrutiny such that they voluntarily injected themselves into the public controversy of their own misconduct.

For example, in *Planet Aid*, the Ninth Circuit addressed defamation claims by charities over statements about their alleged misuse of funds. 44 F.4th at 920–26. The Ninth Circuit explained the "voluntariness requirement" is to be "interpreted broadly" and "not confined to those who seek to influence the resolution of a single issue." *Id.* at 926. Rather, plaintiffs can "voluntarily" insert themselves into a public controversy by engaging "in a course of conduct that foreseeably put themselves at risk of public scrutiny with respect to a limited range of issues." *Id.* The *Planet Aid* plaintiffs met this test because they "actively engaged in conduct that invited public comment and attention" by "publicizing" themselves "to thousands of followers through social media" and "promoting themselves through social media." *Id.* at 927–28. The Ninth Circuit also rejected the *Planet Aid* plaintiffs' argument "for narrow definitions of the relevant public controversies" that were "limited to the exact factual contours of the alleged defamation." *Id.* at 928 n.4. This argument was "unsupported by law." *Id.*

Accordingly, here, the relevant question is **not** whether Defendants "voluntarily inserted themselves into a prominent role in the public issue of sexual abuse in the dance industry." [Dismissal Order at 16]. Instead, the relevant question is whether Defendants engaged "in a

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

course of conduct that foreseeably put themselves at risk with respect to a limited range of issues" (like scandals in the dance industry more broadly). *Planet Aid*, 44 F.4th at 926. By their own judicial admissions, Defendants earned fame and success by publicizing and promoting themselves to young dancers across the country, including on social media and through speaking engagements and media publications. *See supra*, Statement of Facts, Section A.

Under *Planet Aid* and its progeny, there is no genuine dispute of material fact that Defendants voluntarily injected themselves into the public controversy concerning their interactions with those young dancers. *See, e.g.*, *Makaeff*, 715 F.3d at 269–70 (holding that Trump University's direct and indirect promotion of its "educational practices" makes it "a limited public figure in the context of the controversy over those practices"); *CZ Servs., Inc. v. Express Scripts Holding Co*., 2023 WL 5695996 at *1–2 (9th Cir. Sept. 5, 2023) (holding that engagement in a "PR campaign" that reached millions of consumers constituted voluntary injection into a public controversy); *Planet Aid*, 44 F.4th at 927 (holding that "by actively seeking attention from the press, promoting themselves through social media . . . [plaintiffs] assumed a risk of public scrutiny"); *Grishin v. Sulkess*, 2019 WL 4418543, at *6 (C.D. Cal. May 31, 2019) (holding that "Grishin invited public comment and debate by . . . revealing aspects of his personal life to a widespread public social media following").

## C. Defendants Cannot Show by Clear and Convincing Evidence That Plaintiffs Acted with Actual Malice.

Because Defendants are public figures—or, at a minimum, limited purpose public figures—they bear the burden to establish that a reasonable factfinder could conclude, by clear and convincing evidence, that Plaintiffs made the allegedly defamatory statements with actual malice—that is, with knowledge of its falsity or reckless disregard for its truth. *See Pegasus*, 57 P.3d at 92 ("The question of actual malice goes to the jury only if there is sufficient evidence for the jury, by clear and convincing evidence, to reasonably infer that the publication was made

1    with actual malice."); *Wynn v. Associated Press*, 555 P.3d 272, 278 (Nev. 2024) (holding that

2    "a plaintiff must provide evidence that would be sufficient for a jury, by clear and convincing

3    evidence, to reasonably infer that the publication was made with actual malice"). The actual

4    malice requirement is a "stringent standard" that focuses on the subjective belief of the speaker.

5    *See Pope v. Motel 6*, 114 P.3d 277, 284 (Nev. 2005). Defendants' claims must be rejected

6    because there is no genuine dispute of material fact that Plaintiffs believe their statements are

7    true. There is no evidence, let alone clear and convincing evidence, of actual malice here.

8

9                1.    The Court Must Assess Actual Malice at the Summary Judgment Stage.

10          The Supreme Court has held that in defamation cases, "as expositors of the Constitution,

11   [judges] must independently decide whether the evidence in the record is sufficient to cross the

12   constitutional threshold that bars the entry of any judgment that is not supported by clear and

13   convincing proof of 'actual malice.'" *See Bose Corp. v. Consumers Unions of U.S., Inc.*, 466

14   U.S. 485, 511 (1984); *Planet Aid*, 44 F.4th at 928 (stating that at the summary judgment stage,

15   the judge must determine "if the evidence in the record would permit a reasonable finder of fact,

16   by clear and convincing evidence to conclude that [defendants] published a defamatory

17   statement with actual malice").

18

19          Judges review the record evidence to ensure that the "actual malice" standard can be

20   met—including whether the record overcomes the high bar of clear and convincing evidence—

21   so as to prevent the trampling of constitutional rights. *See, e.g.*, *Carafano*, 207 F. Supp. 2d at

22   1070–73 (granting summary judgment on defamation claim for failure to demonstrate actual

23   malice); *Pegasus*, 57 P.3d at 93 (affirming summary judgment on defamation claim due to

24   failure to show actual malice); *Jankovic v. Int'l Crisis Grp*., 72 F. Supp. 3d 284, 309 (D.D.C.

25   2014), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016) (granting summary judgment in favor of defendant

26   organization and noting the Supreme Court's requirement in *Bose* that judges "must

27   independently decide" whether the record evidence supports a finding of actual malice by clear

28

                                        28

1    and convincing evidence). This role reflects a "profound national commitment to the free

2    exchange of ideas, as enshrined in the First Amendment" which "demands that the law of libel

3    carve out an area of 'breathing space' so that protected speech is not discouraged." *Harte-Hanks*

4    *Commc'ns v. Connaughton*, 491 U.S. 657, 685–86 (1989) (citation omitted).

5              2. The Actual Malice Standard Looks to the Subjective Belief of the Speaker.

6         Whether Plaintiffs made any statement with actual malice is a question suited for

7    resolution at the summary judgment stage because "[t]he question whether the evidence in the

8    record in a defamation case is sufficient to support a finding of actual malice is a question of

9    law." *Harte-Hanks*, 491 U.S. at 685 (citing *Bose*, 466 U.S. at 510–11).

10

11        In assessing whether there is sufficient evidence demonstrating actual malice, the

12   appropriate inquiry is into the **subjective belief of the speaker** and what they "believed and

13   intended to convey." *Holbrook v. Whorton*, 473 F. App'x 585, 586–87 (9th Cir. 2012)

14   (affirming a grant of summary judgment because plaintiff failed to provide evidence that

15   defendant subjectively believed statements were false). Actual malice "should not be confused

16   with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson*,

17   501 U.S. at 510. Instead, actual malice refers to the "speakers subjective doubts about the truth

18   of the publication." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001); *see*

19   *Masson*, 501 U.S. at 510. There must be a "high level of awareness" of the probability a

20   statement is false to make an individual liable under the actual malice standard. *Garrison v.*

21   *Louisiana*, 379 U.S. 64, 74 (1964).

22

23        Critically, to determine whether a statement was made with actual malice, courts do *not*

24   consider "whether a reasonably prudent man would have published, or would have investigated

25   before publishing." *Carafano*, 207 F. Supp. 2d at 1073. Instead, "[t]here must be sufficient

26   evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the

27   truth of his publication." *Id.*; *see, e.g.*, *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). In

28

29

1    other words, the analysis focuses on the speaker's subjective "belief regarding truthfulness of
2    the published material." *Allen v. Sunbelt Commc'ns Co.*, 2008 WL 11452330 at *3 (D. Nev.
3    Jan. 22, 2008).

4        Accordingly, allegations that the statements are false—or even proof of their actual
5    falsity—are not enough to prove actual malice. *See id.* ("[D]ue to plaintiff's limited public
6    figure status, she is required to establish that defendants not only publicized a false statement
7    about her, but did so with 'actual malice.'"). Instead, **there must be clear and convincing**
8    **evidence that the individual making the alleged statements subjectively believed them to**
9    **be false**. *Church of Scientology*, 238 F.3d at 174; *Masson*, 501 U.S. at 510. In the absence of
10   countervailing evidence, the speaker's sworn declarations as to the truth of the statements in
11   question are sufficient to refute actual malice. *See e.g.*, *Stark v. Lackey*, 458 P.3d 342, 347 (Nev.
12   2020); *Smith v. Zilverberg*, 481 P.3d 1222, 1229 n.4 (Nev. 2021); *see also Medure v. Vindicator*
13   *Printing Co.,* 273 F. Supp. 2d 588, 597, 594 n.9 (W.D. Pa. 2002) (granting summary judgment
14   in favor of the defendants on the issue of actual malice in part due to the defendant's declaration
15   as to her subjective belief of the truth of her publication).

16       In this case, the relevant question is not whether Plaintiffs' statements are objectively
17   true. Instead, the relevant question is whether *Plaintiffs* subjectively believe their statements
18   are true. Critically, for the purpose of Plaintiffs' motion for summary judgment, Plaintiffs'
19   definition of consent and subjective experience of certain sexual interactions may differ from
20   that of Defendants, and those beliefs may both be sincerely held. In other words, for example,
21   Defendants may sincerely believe that their sexual interactions with Plaintiff Sage Humphries
22   were consensual, and Sage may sincerely believe that those interactions were coerced and
23   abusive. For the purposes of the actual malice inquiry, only Sage's subjective beliefs are
24   relevant, since Sage is the speaker of the allegedly defamatory statements. *See Hughes v.*

25

26

27

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

1   *Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 453 (S.D.N.Y. 2018) ("Hughes fails to

2   plead that Payne's statements maintaining the consensual nature of the affair were made with

3   actual malice."); *see also, e.g.*, *Coleman v. Grand*, 523 F. Supp. 3d 244, 261 (E.D.N.Y. 2021).

4       Consequently, Defendants' bare allegations that *Defendants* believe the sexual

5   encounters were consensual are wholly insufficient to prove that a reasonable juror could

6   conclude with convincing clarity that *Plaintiffs* do not really believe that Defendants abused

7   them. *See, e.g.*, *Allen*, 2008 WL 11452330 at *3 (holding that the relevant inquiry is into the

8   speaker's beliefs, and allegations the statements are false is not enough to show actual malice).

9

10           3.    There is Insufficient Evidence for a Jury to Conclude by Clear and
               Convincing Evidence that Plaintiffs Did Not Subjectively Believe Their
11             Statements to Be True.

12      Here, there is no evidence that Plaintiffs subjectively doubted the veracity of their

13   statements, let alone evidence that would demonstrate actual malice by clear and convincing

14   clarity. Indeed, each Plaintiff submits herewith a declaration affirming under penalty of

15   perjury that her alleged statements are true, and that she subjectively believes those statements

16   are true. [*See* Declarations of Sage Humphries ¶¶ 3–4; Gina Menichino ¶¶ 3–4; Rosemarie

17   DeAngelo ¶¶ 3–4; Danielle Gutierrez ¶¶ 3–4; and Jane Doe 1 ¶¶ 3–4]. These declarations are

18   alone sufficient to disprove actual malice. *See e.g.*, *Stark*, 458 P.3d at 347 ("[W]e have

19   previously held that a sworn declaration like [defendant's] is sufficient evidence that the

20   statements were truthful or made without knowledge of their falsehood"); *Zilverberg*, 481 P.3d

21   at 1229 ("[Defendants] provided declarations and other evidence that support their claim that

22   they believed the statements to be true"); *Medure*, 273 F. Supp. 2d at 598–99 (finding that

23   defendant's sworn declaration that she "did not actually entertain serious doubts about the

24   truth or accuracy" of the alleged defamatory statements was sufficient to disprove actual

25   malice in the face of plaintiff's "fail[ure] to produce any evidence" that defendant "had serious

26

27   doubts").

28

1    Further, Plaintiffs' psychological expert conducted an extensive psychological

2    examination of each Plaintiff and confirmed to a "reasonable degree of psychological

3    certainty" that each Plaintiff has suffered significant mental health consequences in connection

4    with the sexual abuse. [*See* McCawley Decl., Exs. DD, EE, FF, GG, HH]. The psychological

5    testing further showed that Plaintiffs' symptoms are not the result of malingering or feigning.

6    [*See id*.] Defendants have offered no expert testimony or other evidence to rebut those

7    conclusions about Plaintiffs' state of mind.[5]

8

9    There is a complete lack of evidence for Defendants to establish to a factfinder, by a

10   clear and convincing standard, that Plaintiffs harbored subjective doubts as to the truth of the

11   statements.  Here, the lack of evidence in the record is dispositive.  As the Supreme Court has

12   made clear, the possibility that the jury may "disbelieve" Plaintiffs cannot defeat summary

13   judgment on actual malice.  *See Anderson*, 477 U.S. at 256. Defendants' claims that Plaintiffs'

14   statements are untrue is not sufficient to meet the malice standard, and their defamation claims

15   therefore fail. *See, e.g.*, *Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1134 (9th Cir. 1994)

16   ("[D]emonstrating the untruthfulness of the charges does not establish actual malice").

17

18       **IV.    Plaintiffs' Statements Are Protected by NRS § 41.637(4).**

19       Defendants' defamation claims must also be rejected for the additional, independent

20   reason that Plaintiffs' statements are protected by Nevada's Anti-SLAPP statute, NRS

21   41.637(4), as statements made in connection with an issue of public interest.

22       Subsection 4 of Nevada's Anti-SLAPP statute protects a "[c]ommunication made in

23   direct connection with an issue of public interest in a place open to the public or in a public

24   forum [that] is truthful or is made without knowledge of its falsehood." *Moreira-Brown v. Las*

25

26   _____

27   [5]    Additionally, Plaintiffs have been describing their detailed allegations of abuse
     consistently for years. For example, Danielle, Gina, Jane Doe 2, and Sage reported the same
28   substantive allegations they are making her to police as early as 2018. [*See* McCawley Decl.,
     Exs. II, JJ, KK].

                                        32
                    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
                    AND INCORPORATED MEMORANDUM OF LAW

1  *Vegas Rev. J., Inc.*, 648 F. Supp. 3d 1278, 1287 (D. Nev. 2023) (quoting NRS § 41.657(4)).

2  When a defamation defendant meets both prongs under NRS § 41.637(4), the burden shifts to

3  the plaintiff to present a prima facie "probability of prevailing on the claim." *Wynn*, 555 P.3d

4  at 276–78. The term "issue of public interest" is defined broadly to include "any issue in which

5  the public is interested." *Njgard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042 (Cal. Ct.

6  App. 2008) (discussing California's Anti-SLAPP law); *see also Wynn*, 555 P.3d at 279 (noting

7  that Nevada courts "routinely look[] to California courts for guidance in the area of anti-SLAPP

8  law"). "[T]he issue need not be 'significant' to be protected by the anti-SLAPP statute – it is

9  enough that it is one in which the public takes an interest." *Id*.

10

11  **A.  Plaintiffs' Statements Were Made in Direct Connection with an Issue of Public Interest in a Public Forum.**

12

13  In the Dismissal Order, the Court held it was "unclear at this stage whether Plaintiffs'

14  alleged statements are protected under NRS 41.637(4) as statements made in direct connection

15  with an issue of public interest a public forum." [Dismissal Order at 10]. Plaintiffs'

16  statements were made in direct connection with an issue of public interest for multiple,

17  independent reasons.

18  *First*, as set forth *supra*, Section III.A-B, Defendants are public figures. It is well-settled

19  that statements regarding public figures are of public interest. *See, e.g.*, *Wynn*, 555 P.3d at 277

20  (holding that article alleging sexual misconduct by Steve Wynn was of public interest because

21  he was "one of the most recognized figures in Nevada"); *Zilverberg*, 481 P.3d at 1227–28

22  (holding that statements regarding bullying and misogynistic behavior of a thrifting influencer

23  was of public interest because it informs the public on whether to do business with them).

24  Plaintiffs' statements that Defendants—two famous members of the dance community—are

25  sexual abusers, is of course of deep interest to dancers, parents of dancers, governmental entities,

26  and individuals that choose to follow or do business with Defendants, among others.

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Second*, even if Defendants were not public figures (they are), allegations of sexual misconduct—even against unknown private citizens—are matters of public concern. *See e.g.*, *Moreira-Brown*, 648 F. Supp. 3d at 1287 (holding statements reporting on allegations in complaint alleging sexual abuse "concern the public's interest in court proceedings"); *Veterans in Politics Int'l, Inc. v. Willick*, 2020 WL 891152, at *1 (Nev. Feb 21, 2020) (reversing order denying anti-SLAPP motion where the court concluded that "each challenged statement" (including one involving sexual misconduct) is "an issue of public interest"); *Grenier v. Taylor*, 183 Cal. Rptr. 3d 867, 876 (Cal. Ct. App. 2015) ("[A]llegations of abuse by members of the clergy and the protection of children concern issues of public interest"); *Terry v. Davis Cmty. Church*, 33 Cal. Rptr. 3d 145, 154 (Cal. Ct. App. 2005) (communications involved issues of public interest "because they involved the societal interest in protecting a substantial number of children from predators"); *M.G. v. Time Warner, Inc.*, 107 Cal. Rptr. 2d 504, 509 (Ct. App. 2001) (explaining that "the general topic of child molestation in youth sports" is "an issue which, like domestic violence, is significant and of public interest"); *Sipple v. Found. For Nat. Progress*, 83 Cal. Rptr. 2d 677, 684 (Cal. Ct. App. 1999) (statements regarding domestic violence protected because "[d]omestic violence is an extremely important public issue in our society"); *Todd v. Lovecruft*, 2020 WL 60199, at *13 (N.D. Cal. Jan. 6, 2020) ("[A]ccusations of abuse on their own can serve the interest of the public at large" because they "contribute to the discussion surrounding sexual assault because they invite discussion on identifying, responding to, and preventing sexual abuse"). Plaintiffs' statements regarding Defendants' history of sexually abusing young dancers are therefore plainly of public concern.

*Third*, Plaintiffs' statements served as warnings about Defendants and about sexual abuse in the dance world more broadly, and courts in this circuit have held that statements that can serve to warn the public concern the public interest. *See e.g.*, *Obsidian Fin. Grp., LLC v.*

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

*Cox*, 740 F.3d 1284, 1292 (9th Cir. 2014) ("[P]ublic allegations that someone is involved in a crime generally are speech on a matter of public concern"); *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 969 (N.D. Cal. 2013), *aff'd,* 609 F. App'x 497 (9th Cir. 2015) (holding that statements that serve as a "warning to consumers not to do business with plaintiffs constitutes an issue of public interest); *Davis v. Avvo, Inc.*, 2012 WL 1067640, at *3 (W.D. Wash. Mar. 28, 2012) (finding that a website allowing public reviews of doctors are of public interest because it "provides information to the general public which may be helpful to them in choosing a doctor, dentist, or lawyer"); *Prehired, LLC v. Provins*, 2023 WL 2717509, at *2, *7 (E.D. Cal. March 30, 2023) (finding that defendant's online statements accusing plaintiff of "false advertising," "systematic abuse" of students, "predatory 'mentorship,'" and "ethical issues" "plainly implicate the public's interest" as a "warning[] to the public").

*Fourth*, Plaintiffs' statements were subject to widespread media coverage, which is alone evidence of public interest. *Eliott v. Lions Gate Ent. Corp.*, 639 F. Supp. 3d 1012, 1024 (C.D. Cal. 2022) ("[M]ajor media outlets devoted substantial attention to NXIVM" making it a matter of public concern); *Church of Scientology v. Wollersheim*, 49 Cal. Rptr. 2d 620, 651 (1996) ("The record reflects the fact that the Church is a matter of public interest, as evidenced by media coverage."); *Holt v. Urb. League of Portland, Inc*., 2023 WL 7017838, at *6 (D. Or. Sept. 28, 2023), *report and recommendation adopted*, 2024 WL 52990 (D. Or. Jan. 4, 2024) (holding that the "media coverage" of a "community advocacy" project rendered statements about its organizer a matter of public interest).

Finally, there is no dispute that Plaintiffs' statements—which were made in newspapers, magazines, and a national television program—were made in a public forum. *See, e.g.*, *Moreira-Brown*, 648 F. Supp. 3d at 1288–89 (holding that for the purposes of Nevada's anti-

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

SLAPP framework "newspapers are a prototypical example of public fora"); *Kosor v. Olympia*,

478 P.3d 390, 395 (Nev. 2020) (determining that for Anti-SLAPP purposes a public forum can

be any publication that "is a vehicle for communicating a message about public matters to a

large and interested community"); *Abrams v. Sanson*, 458 P.3d 1062, 1067 (Nev. 2020)

(holding that an email listserv constitutes a public forum because it is a "medium through which

public matters are communicated").

Therefore, Plaintiffs alleged defamatory statements were made in connection with a

matter of public interest in a public forum.

**B.    Plaintiffs Statements Meet the Good Faith Prong.**

Plaintiffs' statements are "truthful or [were] made without knowledge of [their]

falsehood." *Moreira Brown*, 648 F. Supp. 3d at 1284. Each Plaintiff who is a counterclaim

defendant submits herewith a declaration affirming under penalty of perjury that her allegedly

defamatory statements are true, and she subjectively believes her allegedly defamatory

statements are true. [*See* Declarations of Sage Humphries ¶¶ 3–4; Gina Menichino ¶¶ 3–4;

Rosemarie DeAngelo ¶¶ 3–4, Danielle Gutierrez ¶¶ 3–4, and Jane Doe 1 ¶¶ 3–4].

**C.    Defendants Have Not Shown a Prima Facie Probability of Prevailing
on the Claim.**

Where, as here, a defamation defendant meets both prongs under NRS § 41.637(4), the

burden shifts to the defamation plaintiff to present a prima facie probability of prevailing on the

claim. *Wynn*, 555 P.3d at 277–78 . As discussed herein, Defendants are wholly unable to do so.

Defendants' Newly Asserted Counterclaims were forfeited and are barred; Sage and Gina's

statements to the New York Times are time-barred; none of Plaintiffs' statements were made

with actual malice; and all of Plaintiffs' statements are privileged.

**V.    Plaintiffs' Statements Are Protected by the Fair Report Privilege.**

Defendants' defamation claims fail for the added reason that Plaintiffs' statements are

protected by the fair report privilege. Indeed, each allegedly defamatory statement simply

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

1    reiterates claims that are already publicly accessible in Plaintiffs' complaint. *See, e.g.*, *Allstate*
2    *Ins. Co. v. Shah*, 2017 WL 1228406, at *5 (D. Nev. Mar. 31, 2017) (holding that the fair report
3    privilege applied because the "only statements Allstate is alleged to have made fairly reflect
4    what is in Allstate's complaint").

5        As explained in Plaintiffs' motion to dismiss, Nevada "has long recognized a special
6    privilege of absolute immunity from defamation given to the news media and the general public
7    to report newsworthy events in judicial proceedings." *Sahara Gaming Corp. v. Culinary*
8    *Workers Union Local 226*, 984 P.2d 164, 166 (Nev. 1999). This absolute privilege—known as
9    the fair report privilege—is not limited to "the news media and others engaged in reporting
10    news to the public" and instead "extends to any person who makes a republication of a judicial
11    proceeding from material that is available to the general public" and applies "even where the
12    defamatory statements are published with knowledge of their falsity and personal ill will toward
13    the plaintiff." *Id.* (citation omitted); *see also Adelson v. Harris*, 402 P.3d 665, 668 (Nev. 2017).
14    Accordingly, the fair report privilege "shields anyone who discusses a judicial proceeding as
15    long as that discussion is a fair and accurate description of the proceeding—or here, a fair and
16    accurate description of what is in a complaint." *Allstate*, 2017 WL 1228406, at *5 n.36. "The
17    speaker is protected if she conveys the 'gist' of the action, as measured by how those in the
18    community where the matter was published would reasonably understand it." *Id.* at *5 (internal
19    quotation marks omitted); *see Dorsey v. Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1435 (9th Cir.
20    1992) (whether or not a report is "fair and true" is based not on the truth of the underlying
21    statement, but on "what occurred in the judicial proceeding reported upon or as to what was
22    contained in the report").

26        Here, each of Plaintiffs' statements provides a "fair and accurate description" of "what is
27    in a complaint," and is thus squarely protected by the fair report privilege. *Allstate*, 2017 WL

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

1228406, at *5 n.36. As shown in Appendix A, attached hereto, each of Plaintiffs' statements squarely corresponds to a publicly available allegation contained in the Third Amended Complaint. *See, e.g.*, *Fink v. Oshins*, 49 P.3d 640, 644 (Nev. 2002) (noting "[t]he scope of the absolute privilege is quite broad" and that the purportedly defamatory communication "'need not be strictly relevant to any issue involved' in 'the proposed or pending litigation,' it only need be 'in some way pertinent to the subject of controversy'") (internal citations omitted).

In fact, several of Plaintiffs' allegedly defamatory statements are not even quotes that reporters attribute to Plaintiffs, and are instead **direct quotes that reporters copied and pasted from the complaint itself**. [*Compare, e.g.*, ECF No. 231 ¶ 102 (alleging as a defamatory statement, "**[a]ccording to the lawsuit**, Taylor responded that he wanted to throw Sage in his van, tie her hands and feet, blindfold her, rent a warehouse, hang her from the ceiling, rape her, and leave her to die") (emphasis added); *with* ECF No. 221 ¶ 184 ("On one occasion, Taylor told Sage via Snapchat that he wanted to throw her in his van, tie her hands and feet, blindfold her, rent a warehouse, hang her from the ceiling, rape Sage, 'and leave [her] there to die.'")]. These quotes are protected by the absolute litigation privilege, not only the fair report privilege. *Circus Circus Hotels, Inc. v. Witherspoon*, 657 P.2d 101, 104 (Nev. 1983) ("[C]ommunications uttered or published in the course of judicial proceedings are absolutely privileged.").

Discussion of the contents of a complaint of public record, like Plaintiffs' statements here, is precisely the type of reporting that the fair report privilege is meant to protect. *See, e.g.*, *Moreira-Brown*, 2023 WL 24178, at *8 ("[T]he reporting about these allegations is immunized by the fair-reporting privilege as the 'article offers a fair and true report of [the] lawsuit.'"); *Giarrusso v. Nev. State Bd. of Med. Exam'rs*, 2006 WL 8441893, at *13 (D. Nev. Jan. 26, 2006) ("The Court finds that the allegedly defamatory statements made to the media and/or published on the Medical Board's website are absolutely privileged by virtue of the fact that the statements

1    are a fair and accurate report of the judicial proceeding, namely the complaint which was a

2    public record.").

3         In the Dismissal Order, the Court deferred ruling whether the fair report privilege applies

4    because "factual issues prevent the Court from concluding that the fair reporting privilege

5    applies to Plaintiffs' statements." [Dismissal Order at 10]. The record is clear at this stage that

6    Plaintiffs' alleged statements fall well within the bounds of the fair report privilege. Indeed,

7    each Plaintiff who is a defamation defendant submits herewith a declaration swearing under

8    penalty of perjury that she conveyed no information to reporters beyond that which was already

9    substantively conveyed in her publicly accessible Third Amended Complaint. [*See* Humphries

10   Decl. ¶¶ 5; Menichino Decl. ¶¶ 5; DeAngelo Decl. ¶ 5; Gutierrez Decl. ¶ 5; Jane Doe 1 Decl. ¶

11   5]. Accordingly, Plaintiffs' statements are protected by the fair report privilege, and Defendants'

12   defamation counterclaim must be dismissed. *See, e.g.*, *Blatt v. Pambakian*, 2021 WL 4352329,

13   at *1 (9th Cir. Sept. 24, 2021) (holding district court erred in concluding that litigant's

14   statements to CNN were not covered by California's fair-and-true report privilege because the

15   statements "convey the same gist or sting as the [] Complaint").[6]

16

17

18                                    **CONCLUSION**

19        The Court should grant Plaintiffs' motion for summary judgment as to Defendants'

20   counterclaims because (1) Defendants waived their Newly Asserted Counterclaims, requiring

21

22   _____

23   [6]     Defendants make oblique references to statements beyond those included in Appendix
     A, [*see, e.g.*, ECF No. 231 ¶¶ 179, 180, 190]—in fact, Defendants reference statements that
24   were not even made by Plaintiffs, such as the statement on Madison Breshears Instagram
     account. [ECF No. 231 ¶ 178]. But Plaintiffs limit their analysis only to the specific statements
25   that Defendants quote because "[t]o properly plead defamation, a plaintiff must plead its
     elements with factual specificity," which "requires a plaintiff to identify what the alleged
26   defamatory statements consisted of, who made the alleged defamatory statements, to whom the
     statements were made, and when the statements were made." *Ponder v. Wild*, 2018 WL 473003,
27   at *3 (D. Nev. Jan. 18, 2018) (cleaned up).

28

                                         39
                  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
                  AND INCORPORATED MEMORANDUM OF LAW

1
2
3
4
5
6
7
8
9
10

dismissal of Counts Two, Three, Four, and Five in their entirety, and Count One with respect to Sage's alleged statements to the New York Times, Pointe Magazine, and Cosmopolitan magazine; (2) Defendants' defamation claims based on statements to the New York Times are time-barred, requiring dismissal of Counts One and Four with respect to the Sage and Gina's alleged statements to the New York Times; (3) Defendants must prove actual malice and no actual malice exists, requiring dismissal of all remaining counts; (4) Defendants fail to meet their burden under Nevada's Anti-SLAPP provision, requiring dismissal of all remaining counts; and (5) Plaintiffs' statements are protected by the fair report privilege, requiring dismissal of all remaining counts.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

Dated: January 6, 2025

Respectfully Submitted,

BOIES SCHILLER FLEXNER LLP

/s/ Sigrid S. McCawley
SIGRID S. MCCAWLEY (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
Telephone: 954.356.0011
smccawley@bsfllp.com

SABINA MARIELLA (*pro hac vice*)
LINDSEY RUFF (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone: 212.446.2300
smariella@bsfllp.com
lruff@bsfllp.com

RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: 702.382.7300
Facsimile: 702.382.2755
rpocker@bsfllp.com

*Attorneys for Plaintiffs Sage Humphries,
Gina Menichino, RoseMarie DeAngelo,
Danielle Gutierrez, Jane Doe 1,
and Jane Doe 2*

41
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

**<u>CERTIFICATE OF SERVICE</u>**

1

2          The undersigned hereby certifies that the foregoing Motion for Summary Judgment was

3    served on January 6, 2025 via the Court's CM/ECF electronic filing system addressed to all

4    parties on the e-service list.

5

6                                              /s/ Sigrid S. McCawley
                                               Sigrid S. McCawley
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              42
                      PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
                       AND INCORPORATED MEMORANDUM OF LAW

## APPENDIX A

| Plaintiff | Statement to Press | Corresponding Allegations in TAC |
|---|---|---|
| Sage | "[Taylor] suggested that we all watch a movie together. [The Buttons] thought we should all have one big group sleepover and bring the mattress out into the living room. I thought again that that was uncomfortable, so we just hung out we watched a movie and Dusty had fallen asleep. I was falling asleep and when I was falling asleep that was the first time that [Mitchell] violated me. And, you think that you're going to know to scream or to get up or to make a loud noise or do anything to stop it from happening, but I just froze and my body just tightened and I just waited for it to be over."<br><br>ECF No. 231 ¶ 99 (statements to Good Morning America) | One evening, Taylor placed a mattress in the living room and insisted that Sage and the Buttons all lay on it and watch a movie, with Taylor laying in the middle. At some point, Dusty pretended to fall asleep. Taylor then rolled over and began to sexually assault Sage.<br><br>TAC ¶ 159 |
| Sage | "When they were all back in Boston, the couple barged in on her while she was showering and told her she was now their girlfriend. It was not posed as a question." and "the pair had sex with Sage whenever they wanted, without her consent." More specifically, Sage states "she had grabbed someone's phone to message Taylor via Snapchat, who, along with Dusty, was in Australia. According to the lawsuit, Taylor responded that he wanted to throw Sage in his van, tie her hands and feet, blindfold her, rent a warehouse, hang her from the ceiling, rape her, and leave her to die."<br><br>ECF No. 231 ¶ 102 (statements to Boston Magazine) | After that, the Buttons began having sex with Sage whenever they pleased. Sometimes Taylor would penetrate Sage while she was sleeping.<br><br>TAC ¶ 171<br><br>Taylor regularly shoved Sage to the ground or on the bed and violently penetrated her without her consent.<br><br>TAC ¶ 172<br><br>Sage never consented to these violent sex acts.<br><br>TAC ¶ 176<br><br>On one occasion, Taylor told Sage via Snapchat that he wanted to throw her in his van, tie her hands and feet, blindfold her, rent a warehouse, hang her from the ceiling, rape Sage, "and leave [her] there to die."<br><br>TAC ¶ 184 |

| Sage | "One day it was just us hanging out and the next I had no control over the activities that I did, even if it was just doing laundry or going to the grocery store" "By the time that it got really bad I was completely trapped." And "I had a friend ask me if I was okay, and I was hyper-defensive because I was told by my abusers to shut down any criticism of them"<br><br>ECF No. 231 ¶ 103 (statements to Pointe Magazine) | The Buttons' behavior became increasingly controlling. For instance, the Buttons would insist that Sage drink heavily when she was with them.<br><br>TAC ¶ 154<br><br>Sage felt terrified and like the Buttons had complete control over her life.<br><br>TAC ¶ 166<br><br>They continued to control her social media accounts and conversations with others.<br><br>TAC ¶ 177 |
|---|---|---|
| Sage | "They had complete control over me. If I wanted to do anything, I had to ask them first." and "They had control over my phone and passwords to my Instagram, my email".<br><br>ECF No. 231 ¶ 104 (statements to New York Times) | Taylor helped grow Sage's social media following. Taylor told Sage that he would be able to continue to help her career only if he had full control over her accounts. Taylor took over Sage's posts, text messages, and emails.<br><br>TAC ¶ 158<br><br>Sage felt terrified and like the Buttons had complete control over her life.<br><br>TAC ¶ 166 |
| Sage | This was calculated. These people are predators. This is a pattern." Additionally, Sage stated "Their friendship began in the studio. Then Dusty invited Sage to come to her apartment. The walls were painted black. In one room, a collection of guns was displayed. That's when Sage met Taylor." "Later, when he offered to manage her social media, it made sense to say yes." "Taylor got the passwords to Sage's phone, email and accounts. That's when he started monitoring her communication. Infiltrating everything." And "Now it's interesting to me how the most evil people hide in plain sight, where no one would suspect." | This case is about a couple who has exploited their position of power and influence in the dance world to sexually abuse young dancers across the country.<br><br>TAC ¶ 1<br><br>Taylor helped grow Sage's social media following. Taylor told Sage that he would be able to continue to help her career only if he had full control over her accounts. Taylor took over Sage's posts, text messages, and emails.<br><br>TAC ¶ 158<br><br>They continued to control her social media accounts and conversations with others. |

|  | ECF No. 231 ¶ 175 (statement to Cosmopolitan Magazine) | TAC ¶ 177<br><br>Dusty led Sage into a room of the Buttons' apartment that had an arsenal of guns hanging on the wall.<br><br>TAC ¶ 167 |
|---|---|---|
| Jane Doe 1 | "I am grateful to my fellow dancers for bravely bringing this action and for giving me the courage to come forward and speak out about the abuse I endured. Together we can stop the accused – our abusers – from ever damaging another young, vulnerable dancer."<br><br>ECF No. 231 ¶ 119 (statement to CNN) | Dusty continued to restrain Jane Doe 1, and Taylor forcibly penetrated Jane Doe 1. Jane Doe 1 said "no" and "stop."<br><br>TAC ¶ 142 |
| Gina | "The whole game was to keep him happy. Don't get him angry, or I was unworthy and I would lose my dance career."<br><br>ECF No. 231 ¶ 129 (statement to New York Times) | Conversely, if Gina resisted Taylor's advances, Taylor would retaliate against Gina with emotional abuse and/or by threatening to hurt her dance career<br><br>TAC ¶ 38 |
| Gina | "It's the first memory of when the grooming began", that Counterclaimant Mitchell Taylor Button gave her a teddy bear sprayed with his cologne so she could feel like she was "sleeping" with him and stating "he devised reasons for them to be alone together and it went on for a year and a half. Additionally, Ms. Menichino stated "He [Counterclaimant Mitchell Taylor Button] made her believe that telling anyone about "them" would ruin her career"<br><br>ECF No. 231 ¶ 130 (statement to Cosmopolitan Magazine) | For example, on Gina's 14th birthday, Taylor gave Gina a teddy bear, which he sprayed with his cologne so that Gina could feel like she was "sleeping" with Taylor.<br><br>TAC ¶ 37<br><br>Taylor made special efforts to isolate Gina and confine her in spaces which he controlled. For example, Taylor scheduled rehearsals for Gina's dance solos to be late at night when no one else was in the dance studio .<br><br>TAC ¶ 24<br><br>Conversely, if Gina resisted Taylor's advances, Taylor would retaliate against Gina with emotional abuse and/or by threatening to hurt her dance career.<br><br>TAC ¶ 38 |

| Danielle | "First, he was her teacher who told her she was like his 'little sister'" and "Their [Taylor and Danielle's] relationship affected everything: her mental health, her sense of safety. Even where she went to college – he convinced her to stay local. And because he didn't want her partnering with other men in classes there, she paused on studying dance. He yelled, berated her in public. If someone attempted to intervene, he scared them off by becoming belligerent. She started believing no one could help her. In the worst moments, she was afraid for her life."<br><br>ECF No. 231 ¶ 144 (statement to Cosmopolitan Magazine) | Taylor would be physically affectionate toward Danielle and single her out for special attention. For example, Taylor would often cuddle, caress, and hug Danielle, and Taylor told Danielle he saw her as his "little sister."<br><br>TAC ¶ 64<br><br>Danielle considered attending college out- of-state, but Taylor forced Danielle to attend college in Tampa, Florida so that she would remain close to him.<br><br>TAC ¶ 73<br><br>Taylor became increasingly controlling. For example, Taylor forbid Danielle from participating in her college dance program because he did not want her to dance with other men. Taylor would also instruct Danielle how to dress, and would regularly go through her phone to monitor her texts and phone calls.<br><br>TAC ¶ 74<br><br>Taylor would regularly yell at Danielle and call her names in public, and on several occasions, bystanders attempted to intervene to help Danielle. Taylor would become belligerent and scare away these bystanders, which deepened Danielle's fear of Taylor and belief that no one could help.<br><br>TAC ¶ 82 |
| Rosie | "Rosie wanted them to like her, so she decided to go with the flow. Even if it meant downplaying his unsettling attention. Like how he would insist on taking her out to lunch. And how he slid sexual innuendos into their conversations. Later, after he cornered her alone, he manipulated her into believing that nothing bad was | Taylor was physically affectionate toward Rosie and would single her out for special attention. For example, Taylor would insist on taking Rosie on one-on-one lunch breaks from the dance studio, and he would find opportunities to caress Rosie or hold her hand when they were in private. |

| | | |
|---|---|---|
| | happening to her. He claimed it wasn't illegal because he wasn't that much older." And "He was her mentor; he told her it was okay"<br><br>ECF No. 231 ¶ 154 (statement to Cosmopolitan Magazine) | TAC ¶ 43<br><br>Rosie aspired to be a professional dancer. Given Taylor's purported connections in the dance industry and his status as her dance instructor, Taylor's approval and professional support were invaluable to Rosie.<br><br>TAC ¶ 44<br><br>Taylor began to make sexual comments toward Rosie. For example, Taylor choreographed a solo dance performance for Rosie where she used a stool as a prop, and Taylor told Rosie that he wanted to "bend her over" the stool and perform sexual acts on her.<br><br>TAC ¶ 45<br><br>Taylor told Rosie that it was not illegal for him to perform sexual acts on her because of the size of their age difference. Taylor made this intentionally false statement to a minor in order to keep Rosie silent about the abuse. Taylor convinced Rosie she had no legal recourse for the abuse she suffered.<br><br>TAC ¶ 56 |